**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0640n.06

Case No. 14-4058

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Sep 14, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CASSANDRA DENOMA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| HAMILTON COUNTY COURT OF | ) | |
| COMMON PLEAS, et al., | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: GRIFFIN and DONALD, Circuit Judges; TARNOW, District Judge.[*]

**ARTHUR J. TARNOW, Senior District Judge.** After working as a probation department supervisor and project director for fourteen years, Plaintiff-Appellant Cassandra DeNoma applied for a promotion to work directly beneath Defendant-Appellee Michael Walton, the highest nonjudicial authority in the department. Around the same time, a subordinate who had been romantically involved with Defendant Walton complained to Appellant that he was harassing her, and Appellant referred the subordinate to the Equal Employment Opportunity Commission (EEOC). A three-member committee interviewed Appellant and seven male applicants for the promotion, ultimately recommending two male applicants to the judges. The

---

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

judges appointed the committee's top choice, a lower-ranked supervisor with only three years of supervisory experience.

Appellant brought suit to challenge her non-promotion. She brought a gender discrimination claim against Defendant Walton, alleging that, motivated by sexist bias, he had influenced the interview committee to reject her application. She also brought a retaliation claim against Defendant Judge Charles Kubicki, alleging that he had engineered her non-promotion in retaliation for referring the subordinate to the EEOC. The district court granted both Defendants' motions for summary judgment. For the reasons stated below, we REVERSE as to Appellant's gender discrimination claim against Defendant Walton, AFFIRM as to her retaliation claim against Defendant Kubicki, and REMAND for further proceedings.

## PROCEDURAL BACKGROUND

Appellant Cassandra DeNoma filed the instant suit on October 26, 2012. As relevant to this appeal, her claims included a gender discrimination claim against Defendant Michael Walton under the federal Equal Protection Clause (pursuant to 42 U.S.C. § 1983) and Ohio Rev. Code Ch. 4112, as well as a retaliation claim against Defendant Judge Charles Kubicki under Ohio Rev. Code Ch. 4112. Appellant claimed that Defendants Walton and Kubicki had caused her to be passed over for a promotion due to sexist bias and retaliatory animus, respectively. Defendants Walton and Kubicki filed separate motions for summary judgment. On September 29, 2014, the district court granted Defendants' motions for summary judgment in their entirety. Appellant appealed on October 24, 2014.

## FACTUAL BACKGROUND

Appellant worked for the Hamilton County Adult Probation Department from 1992 until her retirement in 2012. The Probation Department is formally led by the judges of the Hamilton

County Court of Common Pleas, including Defendant Judge Charles Kubicki. Judge Kubicki was the head of the court's Probation Committee at all times relevant to this appeal. Defendant Michael Walton was at all relevant times the Court Administrator and the Chief Administrative Officer for the Probation Department. This position made Defendant Walton the highest authority in the Probation Department aside from the judges.[1]

Appellant began working in the Department as a probation officer in 1992. She was assigned to the Intensive Supervised Probation (ISP) unit, which serves as a sentencing option for judges to divert habitual felony criminal offenders from the prison system through intensive supervision. In 1996, Appellant was promoted to ISP Probation Officer Supervisor. Robert Veatch and Tom Moxley also held the position of ISP supervisor, and each of the three supervisors was responsible for managing a group of approximately six probation officers. In 2006, Appellant was promoted to ISP Project Director. The ISP Project Director reported to the Assistant Chief Probation Officer (ACPO), who in turn reported to Walton. The ACPO position was held by Tim Shannon when Appellant was promoted and then by Patricia Clancy from October 2007 until January 2009. After Clancy left, the ACPO position remained vacant for a time, during which Appellant reported directly to Walton.

In October 2009, the Court's Personnel Director, Krista Ventre, launched an investigation into alleged misconduct and performance deficiencies on the part of Dick Lausten, an ISP officer supervised by Moxley (who in turn was supervised by Appellant). Jerry Campbell, the Assistant Chief Probation Officer for the Municipal Court, served as the hearing officer for Lausten and Moxley's pre-disciplinary hearings. As a result of the investigation's findings, the judges removed Lausten from office for incompetence and misconduct. Campbell found that Moxley's

---

[1] Walton, like Appellant, retired in 2012.

supervision of Lausten was also deficient. However, Moxley resigned before any disciplinary action was taken against him.

Also in the fall of 2009, Walton entered into a romantic relationship with probation officer Lisa Egner, one of his subordinates. In August 2010, Egner informed Appellant and Veatch that she had tried to end the relationship but Walton was harassing her, checking her voicemails and computer and otherwise refusing to leave her alone. Appellant gave Egner the number for the EEOC and suggested that she meet with Human Resources employees, which she did. Egner later complained to Ventre that Appellant and Veatch were pressuring her into filing a lawsuit against Walton.

In the fall of 2010, Judge Kubicki decided that the vacant ACPO position should finally be filled. Ventre prepared a job posting, which was posted on October 27, 2010, and directed applicants to submit their applications to Walton by November 4, 2010. Appellant and seven male officers applied. Meanwhile, on November 1, 2010—three days before the applications were due—Ventre met with Judge Kubicki and informed him of Egner's allegation that Appellant had pressured her to sue Walton.

Around the same time, Judge Kubicki chose three individuals to interview applicants for the ACPO position and present a hiring recommendation to the judges. Kubicki selected Ventre, the personnel director; Campbell, the ACPO for Municipal Court; and Brian Urban, the head of the department's satellite offices or "substations." Walton was out of town during the selection process, and Judge Kubicki did not want him involved in the process. However, before the job opening was posted, Walton had occasionally shared thoughts on good candidates for the position with Ventre. Walton had also expressed dissatisfaction with Appellant's job performance to Ventre.

After interviewing the applicants, the members of the interview committee unanimously selected Joe Elfers, a probation officer supervisor in the substations, as their first choice for ACPO. They also agreed that their second choice was Kevin Bonecutter, a probation officer supervisor in the Municipal Court. The interview committee met with Judge Kubicki to inform him of their recommendations. Judge Kubicki then met with the other judges on the Probation Committee and informed them of the interview committee's recommendations. The Probation Committee voted to accept the interview committee's recommendation of Elfers for the ACPO position, and he was appointed to the position on December 6, 2010.

Around the same time, Judge Kubicki held a meeting with Appellant and Veatch to discuss Egner's allegation that they had pressured her to sue Walton. Judge Kubicki did not formally discipline Appellant or Veatch, but lectured them on the proper response to complaints of harassment and instructed them not to retaliate against Egner. Appellant and Veatch testified at their depositions that Judge Kubicki spoke aggressively and shook his finger at them.

**STANDARD OF REVIEW**

We review a district court's grant of summary judgment de novo. *Longaberger Co. v. Kolt,* 586 F.3d 459, 465 (6th Cir. 2009). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). When determining whether the movant has met this burden, we view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). There is a genuine issue of material fact if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

ANALYSIS

I.      **Gender Discrimination**

Appellant brought a gender discrimination claim against Defendant Walton under the federal Equal Protection Clause (pursuant to 42 U.S.C. § 1983) and Ohio Rev. Code Ch. 4112. These claims may be analyzed under the standards applicable to Title VII claims for disparate treatment on the basis of gender. *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) ("[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983.") (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988)); *Shields v. Fed. Exp. Customer Info. Servs. Inc.*, 499 F. App'x 473, 477 (6th Cir. 2012) ("Ohio courts have held that 'federal case law governing Title VII actions is generally applicable to cases involving alleged violations of' Ohio Rev. Code § 4112.02(A).") (quoting *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999)).

Title VII prohibits an employer's use of an employee's sex as a "motivating factor" for an adverse employment action, even if other factors motivated the action. *See* 42 U.S.C. § 2000e-2(a)(1), (m). Where a plaintiff attempts to prove her Title VII claim through circumstantial evidence, the *McDonnell Douglas* burden-shifting framework guides the analysis. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "The burden is first on the plaintiff to demonstrate a prima facie case of [gender] discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext." *Id.* (quoting *Chen*, 580 F.3d at 400). Here, the parties have not disputed that Appellant raised a genuine issue of material fact on her prima facie case by showing that she was

a woman qualified for the ACPO promotion and that her application for the promotion was rejected in favor of a man.

The analysis is complicated by the fact that Appellant is seeking to establish Walton's liability for the promotion decision even though the decision was formally made by the judges, acting on the recommendation of the interview committee. Due to Walton's indirect relation to the adverse action, the district court and the parties have analyzed Appellant's gender discrimination claim under the "cat's paw" theory of liability. The theory's name refers to a fable in which a cat is duped by a monkey into extracting some chestnuts from a fire, burning its paws in the process. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011). In a traditional cat's paw case, "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker [the cat or cat's paw] as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Thrash v. Miami Univ.*, 549 F. App'x 511, 522 (6th Cir. 2014) (quoting *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)). Appellant's cat's paw claim is nontraditional in the sense that Defendant Walton was the superior, rather than subordinate, of the interview committee members he allegedly used as a conduit for his bias.

The Supreme Court has held that "if a supervisor performs an act motivated by [prohibited] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" under the cat's paw theory. *Staub*, 131 S. Ct. at 1194 (footnote omitted).[2] The intent element is satisfied if the supervisor believes the adverse action substantially certain to result

---

[2]We have held that *Staub* governs the cat's paw analysis for Title VII claims. *Chattman*, 686 F.3d at 351 n.10.

from his act. *See id.* at 1194 & n.3. The proximate cause requirement "excludes only those link[s] that are too remote, purely contingent, or indirect." *Id.* at 1192 (alteration in original) (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)) (internal quotation marks omitted). Because it is common for an adverse action to have multiple proximate causes, "[n]either independent investigation nor independent judgment on the part of the [formal decisionmaker] provides a *per se* defense." *Chattman*, 686 F.3d at 352.

We have recently declined to consider "whether and to what extent cat's paw liability fits into the [*McDonnell Douglas*] framework." *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 n.3 (6th Cir. 2014) (citing *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011)). In *Chattman*, rather than integrate the doctrines, we analyzed the *McDonnell Douglas* steps and the cat's paw elements separately. 686 F.3d at 347–53. We will do the same here, starting with the cat's paw elements and then proceeding to the *McDonnell Douglas* issue in dispute: whether the legitimate explanations proffered for Appellant's non-promotion are pretextual.

### A.     Cat's Paw Elements

To reiterate, "if a supervisor performs an act motivated by [prohibited] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" under the cat's paw theory. *Staub*, 131 S. Ct. at 1194. We hold that a reasonable jury could find that Defendant Walton, motivated by sexist bias, performed an act intended to cause Appellant's non-promotion, and that act was a proximate cause of Appellant's non-promotion.

A reasonable jury could conclude that Defendant Walton acted with an intent to cause the rejection of Appellant's application for ACPO. Ventre, the probation department's personnel

director and member of the ACPO interview committee, testified at her deposition that Walton had told her he was dissatisfied with the way Appellant ran the ISP program. She could not recall on how many occasions he had told her so. She further testified that, some months prior to the ACPO job posting, Walton talked with her about who he thought would do a good job in the ACPO position. She recalled him mentioning Urban and Campbell as good candidates for the position. She testified that she and Walton had no such discussions after the job was posted. However, she testified that when applicants submitted their applications to Walton, as the posting instructed them to do, Walton gave the applications to her. She did not recall any conversations with him as the applications came in. She also testified that, although Walton was out of town during the interview and recommendation process, she thinks she spoke with him on the phone during that time.

Based on this testimony, a reasonable jury could conclude that Walton shared his opinion on Appellant's job performance and on candidates for the ACPO position with Ventre with an intent to cause Appellant to be denied further promotion. Even if all of these communications occurred before the ACPO job was posted and Ventre was appointed to the interview committee, Walton likely expected Ventre to be involved in the promotion decision: Ventre participated in all interviews for probation jobs.

A reasonable jury could also conclude that in sharing opinions with Ventre that would discourage her from recommending Appellant, Walton was motivated by a sexist bias. Patricia Clancy (who served as ACPO under Walton) testified at her deposition that Walton afforded male employees more authority and respect and gave preferential treatment to the substations, which were led by men and operated "like a little old boys network." She further testified that, because Appellant is a woman, she believed it would be difficult for Appellant to advance if

Walton were making decisions. Probation officer Jodie George similarly testified at her deposition that Walton favored the substations, which were dominated by men after Walton, on the advice of substation officers, moved women officers out of the substations. George further testified that during a period of time when she, Appellant, and Urban held equal positions and reported directly to Walton, Walton gave Urban (the only man out of the three) preferential treatment. She testified that she believed Appellant did not have a fair chance to succeed in her position because she was not a member of a core group of officers favored by Walton, which was a "male's club."

It is true that George declined to definitively attribute the diminished opportunities for herself and Appellant to their gender. She instead cited their exclusion from "the group." She described the group as a "male's club," but attributed its members' inclusion in the group to their "attitudes." When asked if she believed Walton had a bias against women, she responded as follows: "I don't know if it was necessarily women, or if it was because he was surrounded by the group that he was surrounded by and they had a certain type of mentality that, you know, that's what was promoted and that type of, you know, person was the way probation was going to be."

George's testimony is probative evidence of a sexist bias on Walton's part despite her failure to unequivocally attribute the problems to gender. When asked if Walton had a gender bias, George suggested that he favored a certain attitude concerning the type of person that probation officers were going to be. Earlier, when asked how Walton's preference for the substations reflected a gender problem, George testified that the substations embraced a view of the department's work that she summarized as "we're more police than we are probation." Clancy similarly testified that the substation officers liked to do "police work," such as extended

surveillance and cooperation with police officers on searches of probationers' homes. Traditional gender stereotypes hold women less suited than men for police work. Indeed, George most closely associated the "police work" attitude with Joe Elfers, who, she claimed, expressed a distaste for working with her in the field because he might need to take care of her. She also testified that she believed a woman was transferred out of the substations because she was assumed to be afraid to work there. Since George attributed Walton's disparate treatment of probation officers to an attitude closely associated with gender stereotypes, her failure to definitively attribute it to gender does not substantially diminish her testimony's probative value regarding Walton's alleged gender bias.

Defendants mount several challenges to the credibility of George and Clancy's testimony concerning Walton's gender bias. Defendants argue that Clancy's testimony is not entitled to weight because she was asked to provide specific examples of Walton's disparate treatment and failed to do so satisfactorily. They point out that Clancy testified that Walton would "run interference" for substation officers threatened with discipline, but the only example of such interference she provided involved a female officer. Defendants further question the extent of Clancy and George's knowledge of Walton and the probation department. Relatedly, they assert that despite Clancy and George's suggestion that Appellant was unlikely to advance as a woman, several women were promoted to management positions during Walton's tenure. These challenges may be appropriate for consideration by the jury in determining what weight to give the witnesses' testimony. A reasonable jury *could*, however, credit their testimony and find that Walton had a sexist bias. The jury could, in turn, find that his bias motivated his opposition to Appellant's promotion.

Finally, a reasonable jury could find that Walton's communications with Ventre were a proximate cause of the rejection of Appellant's application. In affidavits, the three committee members all denied that they considered Walton's preferences when making their recommendation. However, a reasonable jury could reject that testimony. "[A] biased employee's 'position [of] influence' is probative of that employee's ability to influence the ultimate decisionmaker." *Chattman*, 686 F.3d at 353 (second alteration in original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)). Here, Walton was the committee members' superior. Moreover, there is evidence that the committee members were close to Walton professionally. A reasonable jury could thus find that Ventre opposed Appellant's selection by the committee as a matter of course because Walton had criticized her job performance and omitted her when discussing good candidates for the position. This conclusion would render Walton's act a proximate cause of the rejection of Appellant's application, even if not the sole cause. *See id.* at 352 (acknowledging that a biased supervisor's recommendation or report "may be a causal factor in the adverse action" despite independent judgment or investigation on the part of the formal decisionmaker, if the latter "takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.") (quoting *Staub*, 131 S. Ct. at 1193).

**B.    Pretext**

Defendants have advanced a legitimate explanation for the promotion decision, arguing that it was based on merit. The committee members testified that they considered Elfers the most qualified candidate due to his interview performance, letters of support from the community, and his success in the substations, which had been memorialized in Employee of the Year awards for himself and a subordinate. They testified that they considered Appellant less

qualified than Elfers and Bonecutter because of her interview performance, her failure to prevent the Lausten/Moxley problems, and (in Ventre's case) a poor governmental assessment of Appellant's ISP Program in 2009. [3] We hold that Appellant has raised a genuine issue of material fact on whether these explanations are pretextual by providing evidence of a discriminatory environment and evidence that she was at least as qualified as Elfers for the ACPO position.

> We have set forth the following standards for showing pretext via relative qualifications:
>
> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents *other evidence of discrimination.* In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment. On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be *so significantly better* than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former.

*Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626–27 (6th Cir. 2006) (citation omitted). We have, on several occasions, held that plaintiffs raised genuine disputes on the pretext issue where they presented evidence of a discriminatory atmosphere in the workplace alongside evidence of at least equal qualifications. *See Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 668–69 (6th Cir. 2013); *Bartlett v. Gates,* 421 F. App'x 485, 490–92 (6th Cir. 2010); *Risch v. Royal Oak Police Dep't,* 581 F.3d 383, 392–93 (6th Cir. 2009). We have also found a plaintiff

---

[3] Appellant argues that the interview *process* favored Elfers over her because he was allowed to submit letters of support and he, unlike Appellant, had been given recent performance evaluations. However, Appellant has presented no persuasive evidence that she was barred from submitting letters or denied performance evaluations that would normally have been done.

to be a plainly superior candidate, negating her need to present other evidence of discrimination, where she had eleven years of relevant supervisory experience and the promoted employee had only three. *Philbrick v. Holder*, 583 F. App'x 478, 485 (6th Cir. 2014). We so held even though the plaintiff's experience was arguably narrower than her counterpart's and she had received lower interview scores. *Id.*

Here, the gap in relevant supervisory experience is even greater than in *Philbrick*. Appellant had fourteen years of supervisory experience: ten as a Probation Officer Supervisor and four as Director of the ISP Program. In contrast, Elfers had only three years of supervisory experience—and even that experience was as a Probation Officer Supervisor in the substations, responsible for supervising only one or two officers. Veatch, another candidate for the ACPO position, testified that Elfers was less qualified than Appellant in part because he lacked experience in the main branch and with administrative matters such as administering grants. Veatch testified that he thinks Appellant was the most qualified applicant for the ACPO position.

Defendants argue that Appellant's more extensive supervisory experience casts little doubt on the interview committee's explanations because Appellant did not perform well as a supervisor. All three committee members testified that they thought less of Appellant's credentials because she was Moxley's supervisor during the time he was found to have poorly supervised Lausten, who was fired for poor performance. Ventre also testified that she believed Appellant was leading the ISP program poorly because a 2009 government report stated that the program was functioning poorly compared to other counties. However, Appellant questions the credibility of Ventre's testimony concerning her reliance on the 2009 report. More importantly, Appellant's alleged poor performance was not memorialized in any formal discipline or negative

performance evaluations.[4]  A reasonable jury could discredit the committee members' claims to have discounted Appellant's extensive supervisory experience due to their subjective impressions of her performance as a supervisor.

Appellant has also presented evidence of a discriminatory atmosphere in the department. As discussed earlier, Clancy and George testified that they believed Appellant's opportunity for advancement was limited by her gender or by her exclusion from a gendered in-group.  We have held that nondecisionmakers may provide circumstantial evidence of discrimination by opining that an employee's membership in a protected class played a role in an employment decision. *See Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 437 (6th Cir. 2002) (holding that a manager provided circumstantial evidence of discrimination by testifying at his deposition that he believed the plaintiff's race was a factor in the company's decision not to promote him, even though the manager was not involved in the decision); *Carter v. Univ. of Toledo*, 349 F.3d 269, 271–72, 274–76 (6th Cir. 2003) (holding that a black plaintiff had created a genuine issue of fact on the pretext issue by testifying that a university vice provost, when asked by the plaintiff whether her contract would be renewed, said that his superior did not want to employ black professors).  Here, neither Clancy nor George specifically opined that Appellant's application for the ACPO position was rejected due to her gender.  Their opinions' lack of specificity detracts from their probative value regarding the reasons for Appellant's non-promotion, but does not render them immaterial.

---

[4]Defendants concede that Appellant was never formally disciplined or given a negative evaluation, but allege that she would have suffered consequences for the Lausten/Moxley affair but for internal politics among the judges.  We, however, have a duty to draw reasonable inferences in favor of Appellant, as the party opposing summary judgment.  *Smith*, 477 F.3d at 861.  Defendants have presented insufficient evidence of political favoritism to overcome the reasonable inference that Appellant was not disciplined because the decisionmakers believed discipline unwarranted.

More importantly, Clancy and George testified to discrimination in the department aside from Appellant's promotion opportunities. Clancy testified that Walton gave male employees more authority and respect and shared information with them more readily. George testified that during a period of time when she, Appellant, and Urban held equal positions and reported directly to Walton, Walton gave Urban (the only man out of the three) preferential treatment. George further testified that Elfers, the substation officer chosen for the promotion, held a biased attitude towards women, and that his attitude towards women persisted in the department at the time of her testimony.

We hold that Appellant's evidence of a discriminatory atmosphere is a sufficient supplement to Appellant's qualifications evidence to raise a genuine dispute on the pretext issue.

### C.    Conclusion

Appellant has raised genuine issues of material fact regarding whether, as a result of Defendant Walton's use of the interview committee as a "cat's paw," her gender was a motivating factor in her non-promotion. We therefore REVERSE the district court's grant of summary judgment to Defendant Walton on Appellant's gender discrimination claim and REMAND for further proceedings.

## II.    Retaliation

Appellant brought a retaliation claim against Judge Kubicki under Ohio Rev. Code Ch. 4112. The analysis of a retaliation claim under Ohio law is identical to the analysis of a retaliation claim under Title VII. *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 329–30 (6th Cir. 2013) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541 (6th Cir. 2003)). To establish such a claim, a plaintiff must show that she engaged in protected conduct and that her protected conduct was a but-for cause of an adverse employment action. *Montell v.*

*Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)); *see also Smith v. Dep't of Pub. Safety*, 997 N.E.2d 597, 614 (Ohio Ct. App. 2013) (adopting *Nassar*'s but-for causation standard for claims under Ohio retaliation law).

Here, the parties do not dispute whether Appellant engaged in protected activity by referring Egner to the EEOC. The district court concluded that a reasonable jury could infer that Judge Kubicki was angered by her protected activity. Defendants object to this conclusion. Their objection is unpersuasive, but the issue is unnecessary to resolve. Even if Judge Kubicki was angered by Appellant's protected activity, Appellant has failed raise a genuine issue of material fact regarding whether Judge Kubicki acted on that anger in a manner that caused her to be passed over for the ACPO promotion.

A plaintiff can meet her burden on the causation element by showing very close temporal proximity between an employer's first knowledge of the plaintiff's protected activity and the adverse employment action. *Montell*, 757 F.3d at 505 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). However, temporal proximity is only evidence of causation "if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out." *Id.* at 507. In other words, temporal proximity is not evidence of causation if the employer, in taking the adverse action, merely "proceed[ed] along lines previously contemplated." *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam)).

Appellant attempts to prove causation by relying on temporal proximity. Appellant notes that "after Kubicki learned of [her] protected activity, it was only ten days until Elfers was selected" for the ACPO position (and thirty days until he was formally appointed, due to delays

inherent in the hiring procedure). However, the ACPO position was posted several days *before* Judge Kubicki was informed of Appellant's communication with Egner. The job posting called for all applications to be submitted the following week. Thus, the process of selecting a new ACPO was set in motion before Judge Kubicki learned of Appellant's protected activity. Appellant has not presented evidence that Judge Kubicki accelerated the process after learning of her activity, or that such acceleration would have worked to her disadvantage. Since the timing of the interviews and selection proceeded along lines previously contemplated, they are not evidence of causation.

Appellant also presents several theories concerning how Judge Kubicki may have intervened in the interviewing and selection process to promote other applicants over Appellant. First, citing Judge Kubicki's deposition, Appellant asserts that he "convinced the other judges to support Elfers." However, the deposition testimony she cites does not support her assertion. Judge Kubicki testified that he presented the interview committee's recommendations to the other judges. He testified that Judge Ruehlman walked in and began arguing that Bonecutter was not fit for the ACPO position, after which Judge Kubicki pointed out that Bonecutter was only the committee's second choice, after Elfers. He testified that Judge Ruehlman began criticizing Elfers, but he did not testify that he defended Elfers to the other judges. The testimony does not support Appellant's assertion that Judge Kubicki advocated against her before the other judges, and she presents no other evidence that he did so.

Appellant's second theory is that Judge Kubicki retaliated against her by engineering the committee's non-recommendation. Specifically, she argues that he selected Ventre, Campbell, and Urban for the interview committee because he knew they would not recommend Appellant. She suggests that Judge Kubicki expected Ventre not to recommend Appellant because Ventre

was contemporaneously handling Egner's complaint against her and had been involved in the Lausten/Moxley investigation. Campbell was also involved in the Lausten/Moxley investigation, and Appellant argues that Judge Kubicki expected him to favor Bonecutter over Appellant because Bonecutter was his direct report. Finally, she argues that Judge Kubicki expected Urban to favor Elfers over her because Elfers was his direct report.

Appellant has not raised a genuine issue of material fact regarding whether Judge Kubicki selected the members of the interview committee in retaliation for her protected activity. Appellant's theory is that, but for Judge Kubicki's knowledge of her protected conduct, he would have selected different committee members—members he had less reason to believe would disfavor Appellant. She does not, however, identify who the alternate committee members might have been. Judge Kubicki provided reasons for selecting Ventre, Campbell, and Urban unrelated to any expectation that they would disfavor Appellant: Ventre was the personnel director and Judge Kubicki's go-to person in court administration, particularly for hiring decisions; Campbell was the ACPO for the Municipal Court, and thus the highest-ranking person in the Probation Department; and he believed Urban to be the highest-ranking supervisor in the department not applying for the position. Appellant does not assert that these qualifications were irrelevant or that Judge Kubicki passed over other potential interviewers with similar qualifications. Since she does not explain how Kubicki *could* have selected a committee more favorable to Appellant, let alone why he *would* have done so absent her protected conduct, this theory of retaliation does not rise above the level of speculation.

Finally, Appellant implies that Judge Kubicki simply instructed the committee members to reject Appellant's application. She does not, however, tie any specific evidence to this allegation. Accordingly, this theory of retaliation is also impermissibly speculative.

Appellant has failed to raise a genuine issue of material fact regarding whether Judge Kubicki acted on retaliatory animus in a manner that caused her to be passed over for the ACPO promotion. We therefore AFFIRM the district court's grant of summary judgment to Judge Kubicki on Appellant's retaliation claim.

## CONCLUSION

For the reasons stated above, we REVERSE the judgment of the district court as to Appellant's gender discrimination claim against Defendant Walton, AFFIRM as to her retaliation claim against Defendant Kubicki, and REMAND for further proceedings.

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

I join the portion of the majority's opinion that affirms the summary judgment granted in favor of Judge Charles Kubicki.

However, regarding plaintiff Cassandra DeNoma's sex discrimination claim against defendant Michael Walton, I respectfully dissent from the majority's decision to reverse the summary judgment granted in favor of Walton. In this regard, I diverge from the majority opinion in one critical respect: causation. Under these facts, a reasonable trier of fact could not find that Walton's alleged gender bias was a proximate cause of DeNoma's injury. On the contrary, the asserted causal connection between Walton's bias and the interview committee's—and subsequent hiring committee's—decision not to promote DeNoma rests entirely on speculation and conjecture. For this reason, I would affirm the district court's grant of summary judgment.

DeNoma relies on an inverse cat's paw theory in her attempt to prove that Walton, the supervisor of the three members of the interview committee, infected the committee with his bias and that Walton's bias was a motivating factor in the committee's recommendation to promote two male employees over DeNoma. The cat's paw theory "involves circumstances where a seemingly unbiased decisionmaker makes an adverse employment decision that was in part motivated by a biased subordinate." *Davis v. Omni-Care, Inc.*, 482 F. App'x 102, 109 (6th Cir. 2012) (citing *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009)); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 419−23 (2011). When a plaintiff challenges the denial of a promotion as motivated by a supervisor's discriminatory animus, she "must offer evidence of a 'causal nexus' between the ultimate decisionmaker's decision [not to promote] the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City Wide Serv. Dep't,*

549 F.3d 666, 677 (6th Cir. 2008). In short, a plaintiff must demonstrate that "[b]y *relying on* this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the discriminatory actor's] prejudice—his cat's paw." *Id.* at 678 (emphasis added) (internal quotation marks omitted).

In this case, there is insufficient evidence to establish that the interview committee "rel[ied] on" a discriminatory information flow. On this issue, DeNoma's theory hinges on two facts: first, that Walton had a close working relationship with each of the interview committee members, and, second, that Walton expressed to interview committee member Krista Ventre his thoughts on two good candidates for the Assistant Chief Probation Officer ("ACPO") position and conveyed dissatisfaction with DeNoma's performance. Walton made these comments to Ventre "months" prior to the ACPO job posting. From these facts, DeNoma asserts that a reasonable jury could reasonably infer that Walton may have poisoned the interview committee's recommendation. I do not agree.

Walton was not on either of the selection committees. Nor did he select the members of the interview committee—Judge Kubicki made that decision. There is no evidence that Walton discussed his hiring preferences with the two other committee members or that he expressed his opinion to Ventre near the time the ACPO position was posted. Further, although Ventre testified that Walton had in the past expressed dissatisfaction with DeNoma's performance, Walton never offered Ventre his opinion on DeNoma's qualifications for the ACPO position. Instead, months before the ACPO position was posted, Walton merely expressed his opinion on two employees who might excel as the ACPO. In this regard, the degree to which Walton may have commented on DeNoma's candidacy is weak or nonexistent. Tellingly, neither of the two men Walton mentioned months prior to the job posting were selected for promotion. The two

men Walton mentioned were Brian Urban and Jerry Campbell, who became the other interview committee members.

Moreover, there is no evidence that Ventre shared Walton's opinions with the other interview committee members. All three members stated that they did not consider Walton's preferences in making their recommendation and offered specific reasons why the successful candidate was selected, such as his impressive interview performance and constructive ideas for the future of the probation department. Ventre, for example, averred that she "never considered who Walton might want, or not want, appointed to the Assistant Chief Probation Officer position in 2010 when reaching [her] conclusion as to which applicant(s) to recommend for the position." She also testified, "Mike Walton and I didn't always share the same views on things. Just because he had an opinion of one thing didn't mean that I had to have the same opinion or agree with his opinion." Ultimately, there is insufficient evidence from which a reasonable trier of fact would reasonably infer that the committee relied on discriminatory information from Walton in making its decision. In opposing a supported motion for summary judgment, the non-moving party may not rest on speculation or conjecture, but must demonstrate by admissible evidence the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c), (e); *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) ("[T]his circuit has long held that 'mere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden [of demonstrating a genuine issue of material fact].'").

In an effort to fill this evidentiary void, DeNoma relies on the fact that Walton had close working relationships with the interview committee members. However, this alone is insufficient. In both *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339 (6th Cir. 2012), and *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), cited by the majority,

the discriminatory actors were not just in positions of probable influence; they actually exercised influence over the decisionmaking process. In both cases, our court emphasized that the biased supervisor was "involved in some parts of the discussion" resulting in adverse action. *Chattman*, 686 F.3d at 353; *Ercegovich*, 154 F.3d at 355. Additionally, in *Chattman*, there existed a genuine issue of material fact regarding whether the biased supervisor had discriminated by selectively presenting information to senior decisionmakers because he reported only an African-American employee for engaging in horseplay, not Caucasian employees. *Chattman*, 686 F.3d at 353. In the present case, there is no comparable evidence to suggest that the interview committee received, much less relied on, biased information from Walton.

For these reasons, I respectfully concur in part and dissent in part. I would affirm the judgment of the district court.