RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GLORIA MARSHALL,

>*Plaintiff-Appellant*,

*v.*

THE RAWLINGS COMPANY LLC,

>*Defendant-Appellee*.

No. 16-5614

---

Appeal from the United States District Court for
the Western District of Kentucky at Louisville.
No. 3:14-cv-00359—Thomas B. Russell, District Judge.

Argued: November 30, 2016

Decided and Filed: April 20, 2017

Before: MOORE, SUTTON, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:** J. Chris Sanders, Louisville, Kentucky, for Appellant. Michael D. Risley, STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellee. **ON BRIEF:** J. Chris Sanders, Louisville, Kentucky, Jill M. Guarascio, Louisville, Kentucky, for Appellant. Michael D. Risley, Shannon Antle Hamilton, Rebecca A. Weis, STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court in which WHITE, J., joined, and SUTTON, J., joined in part. SUTTON, J. (pp. 21–23), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Gloria Marshall appeals the district court's judgment granting summary judgment for Defendant-Appellee The Rawlings Company. Marshall was an employee of The Rawlings Company. After taking time off under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, for mental-health problems, which are a disability covered by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, Marshall was demoted and then fired. Marshall alleges claims of FMLA interference, FMLA retaliation, ADA retaliation, and intentional infliction of emotional distress. The district court granted The Rawlings Company's motion for summary judgment on all four claims. For the reasons discussed below, we **AFFIRM** the district court's judgment on Marshall's claims of FMLA interference and intentional infliction of emotional distress, **REVERSE** the district court's judgment on the FMLA retaliation and ADA retaliation claims, and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

The Rawlings Company provides recovery or "cost containment" services to health insurance providers. R. 34-2 (Plumley Aff. at ¶ 6) (Page ID #165); R. 34-3 (Elsner Dep. at 13–14) (Page ID #170). Gloria Marshall began working as a Workers' Compensation Analyst for The Rawlings Company in 2006 and was promoted to Team Lead in 2011. R. 37-1 (Marshall Dep. at 57–60) (Page ID #341).

Marshall suffers from depression, anxiety, and post-traumatic stress disorder. Appellant Br. at 4; R. 34-5 (Marshall Dep. at 109–10) (Page ID #220); R. 37-1 (Marshall Dep. at 40) (Page ID #337). To receive treatment for her mental-health problems, Marshall took her first FMLA leave in February and March 2012. R. 34-5 (Marshall Dep. at 132) (Page ID #224). Marshall's FMLA leave was not planned in advance; she took leave unexpectedly to address acute mental-health problems. *Id.* at 109, 112–13, 134 (Page ID #220–21, 225).

When Marshall returned from leave, she had a backlog of work waiting for her. *Id.* at 133–36 (Page ID #225). Although Marshall did not accumulate new work while she was on leave, there was old work that she had not finished because her leave was unexpected. *Id.* at 133–34 (Page ID #225). Marshall testified that she asked for but was denied assistance clearing out this backlog. *Id.* at 177–78 (Page ID #229). The Rawlings Company, on the other hand, claimed that Marshall did receive assistance catching up on her work. *See* R. 40 (Reply in Support of Summ. J. at 12) (Page ID #507).

In addition to the conflicting evidence about how much help Marshall received catching up on her backlog, there is also conflicting evidence about whether having a backlog was common or, rather, the sign of a serious problem. Another team lead, Elizabeth Estrada, testified that "[i]t was a constant struggle for all Team Leads to stay on top of closing the NR[1] files and I know of many Team Leads who had a constant inventory of NR files that needed closing." R. 37-12 (Estrada Aff. at ¶ 12) (Page ID #435). This statement is imprecise about whether other team leads succeeded in their "struggle" to keep up with the "constant inventory of NR files that needed closing." *Id*. Estrada pointed to an example of an analyst with "a history of tremendous backlog" who was nevertheless promoted to a team-lead position, but this statement is again imprecise. *Id*. at ¶ 15 (Page ID #435). Estrada did not give any context about either what constitutes a "tremendous" backlog or about the analyst's other qualifications. *Id*. For its part, The Rawlings Company pointed to an example of another team lead with a backlog, explaining that it treated Marshall and the other team lead similarly. R. 34-1 (Def.'s Mot. for Summ. J. at 7) (Page ID #131); R. 34-5 (Marshall Dep. at 189–98) (Page ID #231–32). In addition, The Rawlings Company noted that correspondence between Marshall and Vice President Jeff Bradshaw showed that Marshall was consistently falling behind even though she was allegedly working ten to twelve hours per day. R. 34-1 (Def.'s Mot. for Summ. J. at 7) (Page ID #131); R. 34-14 (Marshall & Bradshaw Emails) (Page ID #253–58); R. 34-5 (Marshall Dep. at 214) (Page ID #234). This correspondence may indicate that Marshall's performance problems were more severe than other team leads' problems, but it does not provide information about whether other

---

[1]"NR" stands for "no recovery." *See* R. 34-3 (Elsner Dep. at 16–17) (Page ID #170–71). When an analyst is unable to recover any funds related to a specific file, the analyst marks the file "NR." *See id.* As a team lead, part of Marshall's job was to review her team members' NR files to confirm that no recovery was possible. *See id.*

team leads also struggled, or any other basis of comparison, and does not rebut Estrada's testimony. We do know that after Marshall cleared out her backlog of NR files, Bradshaw quickly became worried that a new backlog was forming. R. 37-2 (Elsner Dep. at 80) (Page ID #398). "[A]t that point [Bradshaw] didn't think [Marshall] was succeeding in her role." *Id.*

In September 2012, The Rawlings Company demoted Marshall from team lead to analyst, the position she initially held at the company. R. 34-2 (Plumley Aff. at ¶ 9) (Page ID #165). Mike Elsner, Division Director for the Workers' Compensation Division and Marshall's second-level supervisor, testified that Bradshaw recommended demoting Marshall to Laura Plumley, then the President of the division, *id.* at ¶ 8 (Page ID #165), and that demoting Marshall was Plumley's decision, R. 37-2 (Elsner Dep. at 80) (Page ID #398). Plumley confirmed Elsner's testimony that she "was the final decision-maker in demoting Plaintiff [Marshall]." R. 34-2 (Plumley Aff. at ¶ 9) (Page ID #165). Plumley stated that her "decision was based solely on Plaintiff's performance as an Analyst and a Team Lead," although she did not state what role Bradshaw's recommendation played in her conclusion that Marshall was performing inadequately. *Id.* at ¶ 12 (Page ID #165). Plumley also said that she "was not familiar with" Marshall's FMLA leave or health conditions when she decided to demote Marshall. *Id.* at ¶ 12 (Page ID #165). Plumley did not inform Marshall about the demotion; Plumley had Bradshaw and Elsner inform Marshall. *Id.* at ¶ 13 (Page ID #165).

Some evidence in the record indicates that after being demoted Marshall excelled as an analyst, but other evidence indicates that she struggled to keep up with her workload even after being given less responsibility. On the one hand, upon Marshall's return from her second leave, she was recognized as a high-performing analyst for having one of "the five highest submitted recoveries in the first quarter" of 2013. R. 37-23 (Elsner Email to Analysts) (Page ID #458). In June 2013, Marshall was exceeding the standard for amount of money invoiced. On the other hand, she was below the standard on other metrics, including number of checks recovered each month, number of files worked on per day, and number of outgoing calls per day. R. 37-2 (Elsner Dep. at 134–36) (Page ID #410); R. 34-18 (Mid-Year Assessment) (Page ID #274–75). Marshall's supervisor Matthew Monyhan submitted a mid-year report covering the first half of 2013 emphasizing similar difficulties. R. 34-18 (Mid-Year Assessment) (Page ID #274–75).

There were also interpersonal problems that started around the time of Marshall's demotion. Marshall testified that, on a few separate occasions, Bradshaw harassed her. First, Marshall testified that during the demotion meeting, which took place in September 2012, Bradshaw "raised his voice and started belittling" her, saying "you don't know what you're doing, you're completely inefficient" and "[y]ou come in here long hours and you still can't get your job done." R. 37-1 (Marshall Dep. at 216) (Page ID #363).

Second, Marshall testified that at a May 2013 celebration lunch for Marshall and the other four analysts with the highest first-quarter recoveries, Bradshaw bullied her. During the lunch, Bradshaw asked a question about morale and when no one responded, he asked Marshall individually. R. 37-1 (Marshall Dep. at 24) (Page ID #370). Marshall testified, "I knew that he wasn't asking me because he wanted my opinion. He wanted to single me out and put me in a corner in front of my coworkers in the middle of a restaurant." *Id.* She further testified that when she gave a very generic answer, Bradshaw "was intentionally trying to escalate . . . the conversation in order to antagonize me" and that she felt "singled out" by "some kind of bully that was just blatantly trying to make me . . . upset." *Id.* at 25–26 (Page ID #371).

Third, Marshall testified about a comment Bradshaw made that, she alleged, showed that Bradshaw's hostility toward her stemmed from her taking FMLA leave for her mental-health problems. In August 2012, Marshall and Bradshaw met to discuss her workload. According to Marshall, the meeting "initiated with him saying a sarcastic comment to me, where he said, 'So are you planning on being out any time soon again?'" R. 34-5 (Marshall Dep. at 166) (Page ID #227). She testified that she "was completely astounded" and "that was just obvious that he was referring to my medical leave . . . I had no vacation or sick time to take any time off, and I was working extremely hard to try to get back. I mean, that was just a rude comment." *Id.*

Only Bradshaw, Marshall, and Elsner (who Marshall alleges also discriminated against her) were in the demotion meeting. Only Bradshaw and Marshall were in the meeting to discuss Marshall's workload. However, other people were present at the celebration lunch. One person who was present, Doug Gurley, another analyst, confirmed Marshall's account. He said that Bradshaw "got so aggressive that all the analysts sat in silence because it was so uncomfortable at the table." R. 37-14 (Gurley Aff. at ¶ 7) (Page ID #447).

In March 2013, Marshall took a second FMLA leave. *See* R. 37-22 (FMLA Leave Chart) (Page ID #457). Marshall also took periods of FMLA leave intermittently from April through August. *Id.* Marshall believed that her coworkers were biased against her both because she had taken FMLA leave and because the reason for her leave was her mental health problems. She said, "I believe that after I had to take that leave, that -- that they no longer had respect for me as a person. That my medical issue, because it was mental health, caused them to think less of me." R. 34-5 (Marshall Dep. at 177–78) (Page ID #229).

Supervisors' concerns about Marshall's performance and Marshall's concerns about her co-workers' bias against her came to a head on September 23, 2013. That day, Elsner observed that Marshall and a coworker were not at their desks for a large portion of the day. R. 37-2 (Elsner Dep. at 154–57) (Page ID #415–16). According to Elsner's testimony, Elsner and Monyhan met with Marshall and her coworker to discuss their lack of productivity. Marshall countered that she had been productive. R. 37-2 (Elsner Dep. at 158) (Page ID #416). Again according to Elsner, Monyhan disputed Marshall's claim that she had been productive, saying that he pulled her phone reports and they showed that she had been logged off of her phone for much of the day. *Id.* at 159 (Page ID #416).

When Elsner and Monyhan asked Marshall about her disengaged attitude, Marshall responded that she had been harassed on two occasions. *Id.* at 161 (Page ID #417). She said that Bradshaw harassed her during the demotion meeting and at the celebration lunch for analysts with high recoveries. *Id.* at 161–63 (Page ID #417); R. 37-1 (Marshall Dep. at 55) (Page ID #374). She explained that she had not reported the harassment previously because she was afraid of being fired. R. 37-2 (Elsner Dep. at 173) (Page ID #420). Elsner said he was required to report the allegation of harassment and he did so. *Id.* at 171–72 (Page ID #419).

Elsner, Plumley, and Marshall met to discuss Marshall's allegation of harassment. R. 34-2 (Plumley Aff. at ¶ 14) (Page ID #166). Plumley attested that, "Based on the information Plaintiff provided, and my experience as an in-house attorney, I did not believe Bradshaw's alleged harassment was actionable—that is, based upon a protected class." *Id.* at ¶ 25 (Page ID #166). She also attested that, "My overall impression from the meeting . . . was that Plaintiff was someone who was not doing her job, had been called on the carpet by her supervisor, and in

order to deflect it, brought up the allegations of harassment against Bradshaw." *Id*. at ¶ 26 (Page ID #166).

Plumley reported to George Rawlings, the company's owner, about the allegations of harassment and her conclusion that the allegations were unfounded. *Id*. at ¶ 27 (Page ID #168). Rawlings met with Marshall soon after the report from Plumley. R. 34-20 (Rawlings Aff. at ¶ 7) (Page ID #279). His affidavit stated that, "I made the decision to terminate Plaintiff's employment during the course of my meeting with Plaintiff when I reached the conclusion she was making false allegations of harassment in order to avoid the consequences of her own excessive absences from her desk the day before." *Id*. at ¶ 14 (Page ID #280). He also stated that, "[a]t the time I terminated Plaintiff's employment I did not know that Plaintiff had ever taken any family and medical leave or that she had any medical conditions." *Id*. at ¶ 19 (Page ID #281).

In May 2014, Marshall filed this lawsuit alleging FMLA interference and FMLA retaliation in violation of 29 U.S.C. § 2615; ADA retaliation in violation of 42 U.S.C. § 12112; and intentional infliction of emotional distress in violation of Kentucky law. The Rawlings Company filed a motion seeking summary judgment on all four claims. The district judge granted The Rawlings Company's motion for summary judgment and dismissed all claims. Marshall timely appealed.

## II.  FMLA RETALIATION

Marshall alleged that The Rawlings Company retaliated against her for taking FMLA leave—first by demoting her, then by firing her. The district court erred by granting The Rawlings Company's motion for summary judgment on Marshall's FMLA retaliation claim.

"[T]he FMLA . . . affords employees protection in the event they suffer retaliation or discrimination for exercising their rights under the FMLA. Specifically, [a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave, nor can they use the taking of FMLA leave as a negative factor in employment actions." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003) (second and third alterations in original). "This prohibition includes retaliatory discharge for taking leave." *Id*. It also includes demotion for

taking leave. *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 391 (6th Cir. 2005). To prove that The Rawlings Company engaged in FMLA retaliation, Marshall must show that taking leave was a causal factor in The Rawlings Company's decisions to demote and then fire her. She can show this causal connection through either direct or indirect evidence. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432 (6th Cir. 2014); *see Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

**A. Cat's Paw Liability**

In her response to defendant's motion for summary judgment, Marshall did not allege that Plumley and George Rawlings, the ultimate decisionmakers, were biased against her because she had taken FMLA leave. Instead, Marshall alleged that Bradshaw and Elsner, lower-level supervisors, were biased against her. She alleged that Bradshaw and Elsner caused her demotion and termination by Plumley and George Rawlings. Regarding the demotion, she alleged Bradshaw and Elsner influenced Plumley, who made the demotion decision. Regarding the termination, she alleged that Bradshaw and Elsner influenced Plumley who, in turn, influenced George Rawlings, who made the termination decision. Because it depends on proving that biased lower-level supervisors influenced the ultimate decisionmakers, Marshall's claim of FMLA retaliation depends on the cat's paw theory of liability. Marshall's case can proceed only if the cat's paw theory of liability applies in FMLA retaliation cases. We hold that the cat's paw theory does apply to claims of FMLA discrimination.

"[T]he term 'cat's-paw' refers to 'one used by another to accomplish his purposes.' In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citations omitted). A plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011).

Previously, we "[a]ssum[ed] without deciding that the cat's paw theory of liability is available in FMLA retaliation cases." *Henderson v. Chrysler Group, LLC*, 610 F. App'x 488, 496 (6th Cir. 2015). We, along with the Supreme Court and other circuit courts, regularly apply the cat's paw theory of liability to a variety of claims. *See, e.g.*, *Staub*, 562 U.S. at 419 (applying the cat's paw theory to a Uniformed Services Employment and Reemployment Rights Act claim); *DeNoma v. Hamilton Cty. Ct. of Common Pleas*, 626 F. App'x 101, 110 (6th Cir. 2015) (applying the cat's paw theory to a § 1983 gender discrimination claim); *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350–51 (6th Cir. 2012) (applying the cat's paw theory to a Title VII race discrimination claim); *Shager v. Upjohn Co.*, 913 F.2d 398, 405–06 (7th Cir. 1990) (applying the cat's paw theory to an Age Discrimination in Employment Act claim). Other circuit courts apply the cat's paw theory of liability to FMLA claims. *See Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (applying the cat's paw theory in a FMLA case, and finding that plaintiff did not meet his burden to prove that the proffered reason for his discharge was pretext); *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 965 (8th Cir. 2012) (applying the cat's paw theory in a FMLA case and affirming a liquidated damages award on the basis of cat's paw liability); *Hyde v. K.B. Home, Inc.*, 355 F. App'x 266, 273–74 (11th Cir. 2009) (applying the cat's paw theory in a FMLA case, and finding that plaintiff did not meet her burden to prove that the biased supervisor actually had input into the decision).

The rationale for the cat's paw theory applies equally to FMLA retaliation claims as to other types of employment discrimination and retaliation claims. The primary rationale for the cat's paw theory of liability is that, because "a company's organizational chart does not always accurately reflect its decisionmaking process," an employee of lower rank may have significant influence over the decisionmaker. *BCI Coca-Cola*, 450 F.3d at 486. The ultimate decisionmaker may be detached from day-to-day operations, and consequently "apt to defer to the judgment of the [person] on the spot" and at risk of being "the conduit of [the lower-level decisionmaker's] prejudice." *Shager*, 913 F.2d at 405. As a result, "[a] biased low-level supervisor with no disciplinary authority might effectuate the termination of an employee from a protected class by recommending discharge or by selectively reporting or even fabricating information in communications with the formal decisionmaker." *BCI Coca-Cola*, 450 F.3d at 486. Given this risk, the cat's paw theory accomplishes two goals. First, the cat's paw theory addresses

situations in which decisionmakers unthinkingly adopt the recommendations of their biased lower-level supervisors; second, it "forecloses a strategic option for employers who might seek to evade liability . . . through willful blindness as to the source of reports and recommendations." *Id.* Because there is just as much possibility of lower-level supervisors influencing decisionmakers to engage in FMLA discrimination as discrimination based on race, gender, military service, or age, it makes sense to apply the cat's paw theory to FMLA claims.

The agency principles that support application of the cat's paw theory to other types of claims also apply to claims of FMLA discrimination. "[S]ubordinate bias theories comport with the basic agency principles incorporated by statute into Title VII" because in "Title VII, the term 'employer' includes not only any 'person engaged in an industry affecting commerce' but 'any agent of such a person.'" *BCI Coca-Cola*, 450 F.3d at 485 (quoting 42 U.S.C. § 2000e(b)); *accord Staub*, 562 U.S. at 420–21 (applying principles of agency law to hold that employer can be liable under the cat's paw theory); *Shager*, 913 F.2d at 404–05 (same). Similarly, in the FMLA "[t]he term 'employer' . . . includes . . . any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). These agency principles also apply to claims of FMLA retaliation. Therefore, we will apply the cat's paw theory of liability to FMLA retaliation claims.

Having determined that we will apply the cat's paw theory of liability to FMLA retaliation claims, we must consider three more questions about cat's paw liability. The first is whether the cat's paw theory of liability applies in situations involving more than one layer of supervision between the plaintiff and the ultimate decisionmaker. This question is relevant to Marshall's termination.**[2]** Marshall alleged that Bradshaw and Elsner sought to fire her in retaliation for taking FMLA leave, which they did by manipulating George Rawlings. George Rawlings was at the top of The Rawlings Company's organizational chart. Plumley was below George Rawlings and above lower-level supervisors Bradshaw and Elsner. Bradshaw and Elsner were below Plumley and above Marshall. Marshall was toward the bottom of the organizational

---

**[2]**In the decision to demote Marshall, Marshall's allegations suggest that Plumley was the ultimate decisionmaker and Bradshaw and Elsner worked together, forming a single layer of supervision between Marshall and Plumley. The question about how to handle multiple layers of intermediate supervision, therefore, is not relevant to the decision to demote Marshall.

chart. The chain of events that led to Marshall's termination started when Elsner reported to Plumley that Marshall made a claim that Bradshaw harassed her. After meeting with Marshall and Elsner, Plumley served as a conduit to George Rawlings, informing him that Marshall made an unfounded claim of harassment. Elsner also told Rawlings that Bradshaw's actions were not harassment. During a brief meeting with Marshall, George Rawlings fired her. Application of the cat's paw theory in this situation encompasses allowing a plaintiff to put forward the theory that a lower-level supervisor (here, Bradshaw and Elsner) influenced an intermediate decisionmaker (Plumley) who in turn, either oblivious to or adopting the subordinate's bias, influenced the ultimate decisionmaker (George Rawlings).

Plaintiffs such as Marshall can proceed on such a theory. All of the justifications for applying the cat's paw theory apply with equal force when there are multiple layers of decisionmakers; consequently, there is no reason to forbid plaintiffs from pursuing a theory that a lower-level supervisor carried out a scheme to discriminate by influencing multiple layers of higher-level supervision. Of course, in some cases, allegations that a lower-level supervisor successfully carried out such a scheme might be far-fetched. But those cases can be screened out using existing legal procedures. Those cases are no reason to bar recovery for plaintiffs who can put forward convincing proof that a biased low-level supervisor influenced multiple layers of higher-level supervisors.

Second, we must address the relationship between the *McDonnell Douglas* burden-shifting framework and cat's paw liability. The *McDonnell Douglas* burden-shifting framework applies to claims of FMLA retaliation based on indirect evidence. Under this framework, a plaintiff has the burden to make a prima facie case of discrimination; if the plaintiff can make a prima facie case, the defendant has the burden to articulate a nondiscriminatory reason for the adverse employment action; if the defendant can provide a nondiscriminatory reason, the plaintiff has the burden to show that the reason was pretext. *Edgar*, 443 F.3d at 508 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). A plaintiff establishes pretext "by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). In some past cases, we "declined to consider whether and to what

extent cat's paw liability fits into the [*McDonnell Douglas*] framework." *DeNoma*, 626 F. App'x at 105 (quotation marks and citations omitted). On the other hand, we have also integrated the *McDonnell Douglas* framework and cat's paw liability by analyzing them one after the other. *Id.* at 105–10; *Chattman*, 686 F.3d at 347–53. Plaintiffs alleging FMLA retaliation based on a cat's paw theory of liability must satisfy the requirements of the *McDonnell Douglas* framework and prove that the decisionmaker was the cat's paw of a biased subordinate, so it makes sense to analyze each issue separately. As both *Chatman* and *DeNoma* show, proceeding in this manner is straightforward. We see no reason not to continue with this approach.

Third and finally, we must address how the honest-belief rule applies in cases proceeding on a cat's paw theory of liability. Under the honest-belief rule, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). The honest-belief rule applies "where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.* (internal quotation marks omitted). "The rationale behind the [honest-belief] rule is that the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Smith*, 155 F.3d at 806.

Cat's paw liability, however, rests on the premise that organizational employers do not operate in a vacuum, and that a decisionmaker might rely on the recommendation of a biased lower-level supervisor. *See Staub*, 562 U.S. at 418–21. In such circumstances, the honesty or sincerity of the decisionmaker's belief is irrelevant. What is relevant is that the belief is rooted in a biased recommendation. *See Staub* 562 U.S. at 418–19 ("the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm"). In a cat's paw case, the allegation is that a biased subordinate intentionally manipulated the decisionmaker. Under these

circumstances, the decisionmaker's intent does not matter, and consequently the honesty of the decisionmaker's belief does not matter.[3]

That is not to say that evidence of a biased recommendation is always sufficient to sustain a cat's paw theory. A supervisor who conducts an in-depth and truly independent investigation is not being manipulated by biased lower-level supervisors, but rather making a decision based on an independent evaluation of the situation. If the decisionmaker conducts an investigation that "results in an adverse action for reasons *unrelated to* the supervisor's original biased action . . . then the employer will not be liable." *Staub*, 562 U.S. at 421 (emphasis added). As the Court explained, however, there is no "hard-and-fast rule" that a decisionmaker's independent investigation defeats a cat's paw claim. *Id.* at 420. Rather, "the traditional tort-law concept of proximate cause" applies. *Id.* (citations omitted). Thus, an independent investigation defeats a cat's paw claim only when the investigation "determin[es] that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* at 421; *see Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 797 (6th Cir. 2013) (concluding that "independent fact gathering" is necessary to defeat a cat's paw claim).[4]

## B. The Rawlings Company Is Not Entitled to Summary Judgment on Marshall's FMLA Retaliation Claim

Having addressed these legal questions, we now consider their application to the facts of this case. The district court granted summary judgment in favor of The Rawlings Company. We review de novo a district court's grant of summary judgment. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Summary judgment is proper "if the movant shows that there

---

[3]In a cat's paw case, the honest-belief rule might apply to the allegedly biased lower-level decisionmaker; that is, the defendant might be able to show that the lower-level subordinate was not actually biased by showing that the lower-level subordinate held an honest belief that justified the adverse action against the plaintiff.

[4]In one example of an investigation sufficiently independent to "change the subordinate's discriminatory animus from a proximate cause to a cause that is too remote to support cat's paw liability," a fire department supervisor, who was potentially biased, filed charges with the Board of Fire and Police Commissioners, the ultimate decisionmaker, requesting that the Board terminate a fire department employee. *Woods v. City of Berwyn*, 803 F.3d 865, 868, 870 (7th Cir. 2015). The Board held a hearing and "heard testimony, opening and closing statements, viewed exhibits and ruled on objections." *Id.* at 868. The Seventh Circuit held that "the hearing broke the chain of causation because the record shows that the Board did not rely on the facts presented by the presumably biased [supervisor]. Instead, the Board relied on testimony from [a different fire department employee], who did not harbor any discriminatory animus." *Id.* at 871.

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court determines whether there are genuine disputes of material fact that should go to a jury; it does not find facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). There is a genuine dispute of material fact if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The party moving for summary judgment carries the initial burden of showing the absence of a genuine dispute of material fact; if it satisfies that burden, the nonmoving party must show "specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* FED. R. CIV. P. 56(c).

In this FMLA retaliation case, where there is no direct evidence of retaliation, we must apply the *McDonnell Douglas* burden-shifting framework. At the summary judgment stage, we must determine whether, within the steps of the *McDonnell Douglas* framework, there are genuine disputes of material fact. And, keeping in mind our conclusion about the best way to proceed in cases implicating both the *McDonnell Douglas* burden-shifting framework and the cat's paw theory of liability, we will begin by analyzing the allegations of FMLA retaliation against Bradshaw and Elsner. If we determine that Marshall's allegations against Bradshaw and Elsner would satisfy the *McDonnell Douglas* framework, we will analyze Marshall's cat's paw allegations.

Moving to application of the *McDonnell Douglas* framework to Marshall's allegations against Bradshaw and Elsner, we first ask whether Marshall made a prima facie case of FMLA retaliation. *Edgar*, 443 F.3d at 508. A plaintiff establishes a prima facie case of FMLA retaliation by showing that she availed herself of a protected right under the FMLA; her employer knew she availed herself of her right under the FMLA; she suffered an adverse employment action; and there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Id.*; *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). The first three elements are undisputed. There is no dispute that Marshall took FMLA leave. There is no dispute that Bradshaw and Elsner knew that Marshall

took FMLA leave.  There is also no dispute that Marshall suffered two adverse actions, as she was demoted after her first FMLA leave and fired after her second FMLA leave.

The fourth element is disputed.  Marshall alleged that Bradshaw expressed animosity toward her and that he made inappropriate comments about her FMLA leave, and that Bradshaw and Elsner were motivated to demote her and then fire her because she took FMLA leave.  The Rawlings Company countered that it did not demote Marshall because she took FMLA leave, but rather because she was unable to keep up with her workload as a team lead.  The record contains conflicting evidence surrounding Marshall's performance both before and after her demotion, showing that she performed well in some areas and poorly in others.  R. 37-12 (Estrada Aff. at ¶ 12) (Page ID #435); R. 34-14 (Marshall & Bradshaw Emails) (Page ID #253–58); R. 34-5 (Marshall Dep. at 189–98) (Page ID #231–32); R. 34-18 (Mid-Year Assessment) (Page ID #274–75).  The record does not elucidate the relative importance of these different areas or how Marshall's overall performance compares with her co-workers' performance.  And Bradshaw's question about whether Marshall planned to take more leave in the same meeting he directed her to clear the backlog of NR files permits the inference that Bradshaw was displeased with Marshall's previous exercise of her FMLA rights.  R. 37-1 (Marshall Dep. at 166) (Page ID #357).  In addition, the record also contains conflicting evidence as to why George Rawlings fired Marshall.  R. 34-2 (Plumley Aff. at ¶ 25–26) (Page ID #166); R. 34-20 (Rawlings Aff. at ¶ 14) (Page ID #280); R. 34-5 (Marshall Dep. at 166–78) (Page ID #227–29); R. 37-1 (Marshall Dep. at 216) (Page ID #363).  To determine whether Rawlings fired Marshall in retaliation for taking FMLA leave or based on a belief that she attempted to deflect criticism of her excessive breaks by making a false claim of harassment, a trier-of-fact would need to weigh the evidence and make credibility determinations to decide whether to believe Marshall or her supervisors.  The material facts surrounding why The Rawlings Company demoted and fired Marshall are disputed and, on this record, a reasonable jury could find a causal connection between Marshall's use of FMLA leave and the subsequent adverse actions.

Proceeding to the second step, the burden shifts to The Rawlings Company to articulate a legitimate nondiscriminatory reason for the adverse employment actions.  *Edgar*, 443 F.3d at 508.  Again, The Rawlings Company argues that it demoted Marshall because her performance

was inadequate and fired Marshall because she made a false claim of harassment against Bradshaw. If true, these are legitimate reasons for The Rawlings Company's actions.

Marshall responds, however, that her performance was adequate, even exceptional, and that her complaints against Bradshaw were justified, and thus The Rawlings Company's articulated reasons for its actions are pretexts. And, as explained above, it is not clear that Marshall's performance in 2012 justified a demotion, or that her allegations against Bradshaw were false. A trier-of-fact would need to weigh the evidence and make credibility determinations in order to determine why The Rawlings Company demoted and then fired Marshall. There are genuine disputes of material facts relevant to whether The Rawlings Company's articulated nondiscriminatory reasons for demoting and then firing Marshall were based in fact, actually motivated the adverse actions, and were sufficient to warrant those actions. *See Donald*, 667 F.3d at 762.

Therefore, at each step of the *McDonnell Douglas* burden-shifting test, there are genuine disputes of material fact. As far as Marshall's allegation that Bradshaw and Elsner were biased against her is concerned, Marshall's claim survives summary judgment.

We now move to consider cat's paw liability. Because Bradshaw and Elsner were not the final decisionmakers, Marshall's claim survives summary judgment only if there is at least a genuine dispute of material fact as to whether Bradshaw and Elsner influenced Plumley to demote Marshall and influenced George Rawlings to fire Marshall.

There is a genuine dispute of material fact as to whether Bradshaw and Elsner influenced Plumley's decision to demote Marshall. Bradshaw initially recommended demoting Marshall. R. 37-2 (Elsner Dep. at 80) (Page ID #398). Although Plumley testified that she "was the final decision-maker in demoting [Marshall]," R. 34-2 (Plumley Aff. at ¶ 9) (Page ID #165), she did not clarify what role Bradshaw's recommendation played in her decision. Plumley stated that her decision was based on Marshall's performance, but she did not clarify whether her information about Marshall's performance came from Bradshaw or from an independent investigation, *id*. at ¶ 12 (Page ID #165), and The Rawlings Company "offers no evidence that [Plumley] conducted any independent fact gathering," *Sharp*, 726 F.3d at 797. In fact, Plumley's

testimony that she was not familiar at the time with Marshall's use of FMLA leave, R. 34-2 (Plumley Aff. at ¶ 12), strongly suggests that any investigation Plumley may have conducted was cursory at best. Further, there is circumstantial evidence that Bradshaw had a significant influence on Plumley's decision. Plumley appears to have made the decision shortly after receiving Bradshaw's recommendation, which may indicate that she did not independently verify Bradshaw's claims about Marshall's performance. Plumley also had Bradshaw and Elsner inform Marshall that she was being demoted, which may indicate that she viewed their advice as integral to her decisionmaking process. There is a genuine dispute of material fact as to whether Bradshaw and Elsner influenced Plumley's decision to demote Marshall.

There is also a genuine dispute of material fact as to whether Bradshaw and Elsner influenced George Rawlings's decision to fire Marshall. Marshall's allegation is that Bradshaw and Elsner influenced Plumley, who in turn influenced George Rawlings, who made the ultimate decision to fire Marshall. The record provides insufficient information about Bradshaw and Elsner's potential influence over Plumley and Plumley's potential influence over George Rawlings. The record does reveal that when Plumley met with Marshall, Elsner was also present. R. 34-2 (Plumley Aff. at ¶ 14) (Page ID #166). The record also suggests that George Rawlings's only information about the asserted false claim of harassment came from a meeting with Plumley, a conversation with Elsner, and a brief, five- to ten-minute meeting with Marshall, at which he fired Marshall. R. 34-20 (Rawlings Aff. at ¶ 7) (Page ID #279); R. 34-8, (Elsner Aff. at ¶¶ 11–13) (Page ID #241); R. 37-1 (Marshall Dep. at 8) (Page ID #366). Further, Elsner testified that Rawlings was considering terminating Marshall even before Rawlings met with her. R. 34-8, (Elsner Aff. at ¶ 13) (Page ID #241). And there is no indication Plumley or Rawlings ever bothered to ask Bradshaw about his behavior towards Marshall. On this record, a reasonable jury could conclude that Plumley and Rawlings did not conduct an adequate independent investigation—and had no interest in doing so—and merely served as the conduit for their subordinates' retaliatory intent.

Therefore, there are genuine disputes of material fact as to whether Bradshaw and Elsner were biased against Marshall and sought to have her demoted and then fired. There are also genuine disputes of material fact as to whether Bradshaw and Elsner influenced Plumley and

whether Plumley influenced George Rawlings's decision to fire Marshall. Because of these genuine disputes of material fact, the district court erred by granting summary judgment on Marshall's claim of FMLA retaliation.

### III. ADA DISCRIMINATION

Marshall also argues that The Rawlings Company discriminated against her because of her mental-health problems, in violation of the ADA.**5** The ADA prohibits "'discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Demyanovich*, 747 F.3d at 433 (quoting 42 U.S.C. § 12112(a)). "As with FMLA claims, plaintiffs may prove disability discrimination using the *McDonnell Douglas* burden-shifting framework." *Id.*

Marshall makes the same arguments to support her ADA discrimination claim as her FMLA retaliation claim. Marshall testified to her belief that Bradshaw and Elsner were biased against her because she had mental-health problems. R. 34-5 (Marshall Dep. at 177–78) (Page ID #229). She argued that, regarding her demotion, Bradshaw and Elsner influenced Plumley. She argued that, regarding her termination, Bradshaw and Elsner influenced Plumley who, in turn, influenced George Rawlings.

As with Marshall's FMLA retaliation claim, there are genuine disputes of material fact relevant to whether Bradshaw and Elsner were in fact biased against Marshall, and relevant to whether Bradshaw and Elsner influenced Plumley and George Rawlings's decisions to take adverse employment action against her. Because of these genuine disputes of material fact, the district court erred by granting summary judgment on Marshall's claim of ADA discrimination.

---

**5**The Rawlings Company argues that Marshall waived this argument, but Marshall's brief does argue that Bradshaw and Elsner were biased against her because she took FMLA leave and because of her disabilities. *See* Appellant Br. at 34, 37, 39, 41, 44, 49; *see also* Reply Br. at 4–5. Marshall's discussion of the ADA and the differential treatment she received because of her disabilities is sufficient to overcome waiver.

## IV. FMLA INTERFERENCE

Marshall also alleged FMLA interference. The district court did not err by granting summary judgment on Marshall's claim of FMLA interference. Under the FMLA interference theory, "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred, regardless of the intent of the employer." *Seeger*, 681 F.3d at 282 (alteration in original) (internal quotation marks omitted). Interference occurs when an employer "shortchange[s] [an employee's] leave time, den[ies] reinstatement, or otherwise interfere[s] with [an employee's] substantive FMLA rights." *Id.* at 283.

It is undisputed that Marshall received all the FMLA leave she requested, including two longer absences in February 2012 and March 2013 and intermittent days off after March 2013. R. 37-1 (Marshall Dep. at 113–15) (Page ID #346). It is further undisputed that after her first longer FMLA leave, she was reinstated to her position as team lead, R. 34-5 (Marshall Dep. at 133–36) (Page ID #225), and after her second longer FMLA leave, she was reinstated to her position as analyst, R. 37-22 (FMLA Leave Chart) (Page ID #457); R. 37-23 (Elsner Email to Analysts) (Page ID #458). The Rawlings Company prorated the financial and production standards Marshall was required to meet to account for the days she was out on FMLA leave. R. 37-2 (Elsner Dep. at 141) (Page ID #412). Moreover, both adverse employment consequences Marshall faced (demotion and termination) occurred several months after she was initially reinstated to the position she held before taking leave.

Marshall has not produced any evidence to show that Rawlings failed to provide FMLA leave or reinstatement after leave. Like the plaintiff in *Seeger*, she cannot show that her employer denied any of her rights under the FMLA. *Seeger*, 681 F.3d at 283. Therefore, Marshall's FMLA interference claim fails, and the district court did not err by granting summary judgment to The Rawlings Company on this claim.

## V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Finally, Marshall alleged intentional infliction of emotional distress under Kentucky state law. The district court did not err by granting summary judgment on Marshall's state law claim

of intentional infliction of emotional distress (also referred to outrage or outrageous conduct). "Kentucky still takes a restrictive/limited approach to the tort of outrageous conduct, which covers only outrageous and intolerable conduct." *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997) (internal quotation marks and citation omitted). In order to prove intentional infliction of emotional distress "the plaintiff must show that the defendant's conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation marks and citation omitted); *see also Brewer v. Hillard*, 15 S.W.3d 1, 6–7 (Ky. Ct. App. 1999).

None of the facts Marshall alleges rise to the level of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Wathen*, 115 F.3d at 407. Making a snide remark about taking leave, telling an employee she is not doing her job effectively during a demotion meeting, and creating an awkward situation at lunch are not actions so extreme that they are "utterly intolerable in a civilized community." *Id.*

Because no incident at Marshall's workplace rose to the level of extreme and outrageous conduct, the district court did not err by granting summary judgment to The Rawlings Company on Marshall's claim of intentional infliction of emotional distress.

## VI. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment in part and **REVERSE** in part and **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. I agree with the Court that The Rawlings Company did not interfere with Marshall's FMLA leave and did not intentionally inflict emotional distress. Marshall received all of the FMLA leave she requested. And the company's behavior did not surpass Kentucky's high bar for bringing a claim for intentional infliction of emotional distress, which requires extreme and outrageous conduct.

I part ways with the Court on the proper resolution of the ADA discrimination and FMLA retaliation claims. Under our cases, the "honest belief" rule provides an initial answer to these claims. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016). The two decisionmakers, Laura Plumley and George Rawlings, believed that Marshall should be demoted, and eventually fired, because she earned it—as an inefficient employee who falsely claimed harassment to distract from her poor work ethic. At the pretext stage of the *McDonnell Douglas* test, that's all that's needed to show that the plaintiff's claims fail as a matter of law. If this case turned solely on the application of the honest-belief rule, as I read the Court's opinion, all three of us would agree that the employer should prevail.

The Court permits these claims to go to a jury on the ground that the "cat's paw" theory overrides the honest-belief rule. I doubt we can sidestep the honest-belief rule so easily. But even if we could, the "cat's paw" theory fails on its own terms here. Under the theory, a lower-level supervisor, motivated by actionable animus, commits actions or makes recommendations to convince the decisionmaker, oblivious to the discriminatory animus, to take an adverse employment action against the employee. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 418–19, 423 (2011). The upshot is that the decisionmaker does the dirty work for a retaliating supervisor.

But the lower-level supervisors in our case, Jeff Bradshaw and Mike Elsner, were not "motivated by discriminatory animus" and "honestly believed" the nondiscriminatory reasons for the demotion and firing. *Ferrari*, 826 F.3d at 896 & n.5. Start with the evidence with respect to Bradshaw, who recommended Marshall's demotion. After Plumley agreed to demote Marshall,

Bradshaw conveyed that decision to Marshall. Bradshaw's criticism of Marshall at the demotion meeting, as Marshall testified at her deposition, was that Marshall "do[es]n't know what [she's] doing, [she's] completely inefficient. [She] come[s] in here long hours and [she] still can't get [her] job done." R. 37-1 at 27. That reflects an honest belief that Marshall worked too much to do too little, not that she was skipping too much work for her FMLA leave. And the lunch confrontation about office morale was over half a year after the demotion and had nothing to do with Marshall's FMLA leave or mental health. The relevant law prohibits employers from retaliating. It does not obligate them to be polite and cheerful (even if that is the better course).

Bradshaw's allegedly sarcastic question five months after Marshall had returned from her FMLA leave—"So are you planning on being out any time soon again?"—does not alter this conclusion. R. 34-5 at 19. Bradshaw and Marshall met to hammer out a timeline to complete work she could not seem to get done, and Marshall had used vacation and sick time recently. In context, Bradshaw's question was just the sort of stray and ambiguous comment that is insufficient to prove discrimination, which is probably why she didn't mention it when she first alleged he had harassed her. *See, e.g.*, *Donald v. Sybra, Inc.*, 667 F.3d 757, 763–64 (6th Cir. 2012); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025–26 (6th Cir. 1993).

Turn to the evidence with respect to Elsner. He also influenced the demotion decision, and he initiated the inquiry into Bradshaw's alleged harassment, which led to George Rawlings' decision to fire Marshall. On September 23, 2013, Elsner and another supervisor noticed that Marshall and a co-worker were not at their desks most of the day. The supervisors pulled the phone reports to confirm that Marshall and the co-worker hadn't been working. When confronted, the co-worker apologized. But Marshall responded by alleging that Bradshaw had harassed her at the demotion meeting and lunch. Elsner reported the alleged harassment to Human Resources. Elsner, Plumley, and Marshall met to discuss the allegation. Plumley reassured Marshall by saying: "Gloria, you're not going to get fired." R. 37-1 at 36. But Plumley remained unconvinced by Marshall's allegations and reported the investigation to George Rawlings, the owner of the company. Rawlings was the one who thought of firing Marshall, and he did so only after they met to discuss her harassment allegation. Nothing in this

narrative suggests that Elsner had a discriminatory animus toward Marshall.  All the evidence points toward Elsner's honest belief that the harassment allegation was a false excuse to deflect attention away from Marshall's poor work ethic.  Even if there could be a cat's paw of a cat's paw, that was assuredly not the role George Rawlings was playing when *he* suddenly decided to fire Marshall.

For these reasons, I would affirm Judge Russell's thoughtful decision across the board. The Court seeing it otherwise on the FMLA retaliation and ADA discrimination claims, I respectfully dissent from those parts of its ruling.