NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0482n.06

Case No. 16-2658

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 17, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NUA GJOKAJ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| UNITED STATES STEEL CORPORATION, | ) | |
| | ) | O P I N I O N |
| Defendant-Appellee. | ) | |

BEFORE: SUHRHEINRICH, GILMAN, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Nua Gjokaj crushed the tip of his finger in a steel-rolling machine while working at U.S. Steel. After his injury, U.S. Steel sought to provide Gjokaj with medical treatment, but he was uncooperative. According to U.S. Steel, Gjokaj showed up late to multiple follow-up evaluations and lied to medical personnel about having his finger amputated. As a result, U.S. Steel issued three disciplinary notices to Gjokaj—two for failing to follow medical directives and one for misrepresenting his medical condition. Each carried a five-day suspension. After a series of grievance hearings, U.S. Steel converted Gjokaj's suspensions into a discharge. Gjokaj then sued U.S. Steel a year later, bringing various state and federal claims of discrimination, retaliation, and wrongful denials of his statutory rights. The district court granted summary judgment to U.S. Steel on all counts. We affirm.

**I**

Nua Gjokaj worked as an entry-level employee at a U.S. Steel plant in Ecorse, Michigan. He helped convert slabs of steel into coiled rolls. Gjokaj was a member of the United Steel Workers Union. In November 2011, Gjokaj injured his back while on the job. Dr. Madden, the plant medical doctor, diagnosed him with a herniated disc and restricted him to work that required limited bending and no lifting of objects over 20 pounds. She also prescribed medication for his pain and recommended surgery. Gjokaj declined both. Throughout 2012, Gjokaj continued working; however, because of his restrictions, U.S. Steel assigned him to a sedentary job at the company's training facility. After about nine months, Gjokaj "got tired of [] just sitting down all day," so he began performing odd jobs for a supervisor. R. 47-4, Gjokaj Dep. at 33–34, PID 1326–27.

In late 2012, about a year after his back injury, Gjokaj was accepted into an 18-month training program to become a maintenance technician mechanic. He considered this a promotion. The program involved classroom and on-the-job training at locations throughout the plant. During this time, Gjokaj claims that some of his supervisors made "little remarks" to him about his back injury. *Id.* at 167, PID 1356. For example, Gjokaj explained that when they would hand out assignments, he would hear his name followed by, "[w]e can't have him do that." *Id.* at 166, PID 1356. He also recalled a time where he picked something up and a supervisor asked him, "[o]h, is [that] too heavy for you?" *Id.* at 168, PID 1356. Gjokaj does not remember the names of these supervisors or why the remarks were made. Despite these comments, Gjokaj believes U.S. Steel treated him reasonably after he injured his back. *Id.* at 33, PID 1326.

On July 24, 2013, at about 4:30 P.M., Gjokaj suffered a second workplace injury. As he was changing out a roller used to flatten sheets of steel and securing a new one with brackets, the roller actuated downwards, crushing the tip of his right middle finger. Gjokaj immediately noticed that his finger was bleeding profusely and that it "was hanging just like 90 degrees, just flopped over." *Id.* at 58–60, PID 1333. Gjokaj informed the on-duty supervisor, Todd Chartier, who then called U.S. Steel's emergency medical personnel. Gjokaj was transported to Henry Ford Wyandotte Hospital where he arrived at 5:09 P.M.—approximately forty minutes after his injury.

At the hospital, Gjokaj was triaged and his finger was cleaned, stitched, wrapped, and splinted. His final diagnosis was "Primary: Acute crush injury to right middle finger, Additional: Acute complete nail avulsion with nail bed injury, acute distal phalangeal comminuted fracture." R. 39-19, Hospital Notes at 4, PID 703. After Gjokaj was released, he was transported back to the plant medical department.

There, Gjokaj met with John Benitez, the on-duty nurse, to complete an injury report. Benitez instructed Gjokaj to return to plant medical at 7:00 A.M. the next morning so that Dr. Madden could evaluate him. According to Benitez, he scheduled the earliest appointment time so that Gjokaj could receive immediate treatment. Gjokaj expressed anger with this instruction and indicated that he was not going to return in the morning because the plant was too far away and because he would rather see a doctor closer to home. The plant medical department is located on-site at the Ecorse plant, where Gjokaj worked daily, and is about an hour away from Gjokaj's home. Benitez explained to him that, because his finger injury occurred at the workplace, U.S. Steel would cover the costs of his medical care only if he saw the plant physician.

Gjokaj continued to resist, so Benitez called Laura Lieb, the manager of the plant medical department, and she attempted to persuade Gjokaj. According to Lieb, she explained the importance of receiving a follow-up evaluation, reassured him that U.S. Steel would provide him with good care, and informed him that a failure to follow this directive could result in disciplinary action. Gjokaj says he does not remember this conversation.

On July 25, Gjokaj did not show up for his 7:00 A.M. appointment. At 7:40 A.M., Dr. Madden called Gjokaj, but he did not answer. Dr. Madden's notes indicate that Gjokaj returned her call around 10:00 A.M., at which time he requested authorization to be seen at a medical clinic closer to his home. *See also* R. 39-26, Lieb Notes at 3, PID 736 (writing that Gjokaj "called at 10 AM . . . he was at a clinic on Shaner [sic] Road trying to get his own treatment"). Although Gjokaj admits that he was not at plant medical at 7:00 A.M., he denies going to a clinic that morning. Instead, Gjokaj testified that he "was at home." R. 47-4, Gjokaj Dep. at 87, PID 1340.

Eventually, Gjokaj arrived at plant medical around noon and saw Dr. Madden. Dr. Madden took an x-ray of his finger, which revealed that only about half of his fingertip was involved in the accident and that his volar skin was still intact—meaning, his finger had not been completely severed. She diagnosed him with a "comminuted fracture" and noted that, although he had "suffered a partial amputation," after receiving stitches, his finger had been "repaired." R. 39-22, Dr. Madden Notes at 4, PID 716. She cleared him to return to one-handed or sedentary work at the training center.

Before he went back to work, however, she scheduled him to be seen by Dr. Ottoni, an orthopedic hand surgeon, at 1:15 P.M. that afternoon. Before Gjokaj left for his appointment, Lieb instructed him to return afterwards for follow-up. Dr. Ottoni diagnosed Gjokaj with a

"partial amputation [and] fracture," but noted that his "nail bed is still intact," his "skin was closed on each side [of his finger]," and that he had "good volar skin." R. 39-27, Dr. Ottoni Notes at 3, PID 740. Like Dr. Madden, Dr. Ottoni determined that Gjokaj was fit to return to work the next day—July 26—with no use of his right upper extremity.

By 3:00 P.M. on July 25, Gjokaj had not yet returned from his appointment with Dr. Ottoni, so Lieb called him to check in. According to Lieb, Gjokaj told her that "he was in Dr. Ottoni's office waiting for transportation to HF Wyandotte Hospital for a procedure" because his finger "could not be saved so Dr. Ottoni ha[d] to cut it off." R. 39-26, Lieb Notes at 3, PID 736. After offering her condolences, Lieb told Gjokaj to come to plant medical after the procedure. Gjokaj first testified that he did not remember this phone call and later claimed that it "didn't happen" and that he "did not say" those things to Lieb. R. 47-4, Gjokaj Dep. at 103, 149, PID 1343, 1352. Phone records confirm a call from Lieb to Gjokaj at this day and time.

Gjokaj ultimately returned to plant medical at 7:40 P.M. on July 25. Benitez, the on-duty nurse, and Angela Toland, the medical assistant, were working at the time. Both testified that Gjokaj had a brown paper bag over his right hand, secured with duct tape, and that he told them that, "[t]hey had to take it off. They could'nt [sic] save the finger." R. 39-26, Benitez & Toland Notes at 4, PID 737. When Benitez asked Gjokaj why his finger had to be amputated, Gjokaj replied "[b]ecause it was too infected because of all the grease and dirt, that's why they had to cut it off." *Id*. Gjokaj, again, claimed that he did not remember making these statements and then denied them outright.

After Gjokaj informed Benitez and Toland that his finger had to be cut off, Benitez called Lieb to inform her of this turn of events. Lieb told Benitez to have Gjokaj return to plant medical at 7:00 A.M. the following morning—July 26—so that Dr. Madden could re-evaluate

him following the loss of his finger. Gjokaj was upset with this order, contending that Dr. Madden should "come over to see him" and complaining that "[t]here is nothing she can do, the finger is gone." R. 47-2, Benitez Dep. at 105, PID 1299.

On July 26, Gjokaj once again missed his 7:00 A.M. appointment. He called around 8:00 A.M. and spoke with Lieb, telling her, "I'm weak. I didn't eat nothing. I don't feel safe to drive." R. 47-4, Gjokaj Dep. at 109–10, PID 1344–45. According to Lieb, Gjokaj also stated that he had been bleeding heavily during the night. Lieb then transferred Gjokaj to Dr. Madden, who asked him to come in because she was concerned about his condition. Gjokaj agreed for a cab to pick him up.

Gjokaj arrived at plant medical around noon on July 26. His hand was still wrapped in a brown bag, and he was carrying a box of chocolates. Toland testified that, shortly after his arrival, he waived his hand in front of her and said, "just kidding, I got you." R. 39-7, Toland Dep. at 44, PID 622. When Toland asked Gjokaj what he meant, Gjokaj stated, "I have my finger. It's not gone." *Id.* at 46, PID 623. According to Lieb's notes, Gjokaj made a similar statement to the x-ray technician.

Dr. Madden then examined Gjokaj and took another x-ray of his finger. She noted that Gjokaj's "bandaged finger look[ed] good," there was "minimal blood," the "x-ray appear[ed] to [show] all the bony tissue intact," and he had a "return to work" slip from Dr. Ottoni. R. 39-22, Dr. Madden Notes at 4, PID 716. Dr. Madden again cleared Gjokaj to return to "light duty" in a "clean environment," reiterating that he "was completely capable of doing one handed work, at any time post injury." *Id.* She also clarified that, contrary to Gjokaj's statements the night before, "there was never an amputation of the bone." *Id.*

Lieb and Dr. Madden then asked Gjokaj why he previously told several medical personnel that his finger had to be cut off. According to Lieb's notes, Gjokaj replied, "I was so happy that it was not cut off that [I] decided to play a trick on you." R. 39-26, Lieb Notes at 3, PID 736. When asked where he was instead of having this procedure, Gjokaj told Lieb that he went out to dinner with a friend. Lieb reported Gjokaj's behavior to her supervisor, Steve Kovalchik. Kovalchik referred Gjokaj's case to U.S. Steel's Labor Relations Manager, Jennifer Hickey, who then assigned the matter to Michael Simpson, the Labor Relations Representative assigned to the region.

Simpson issued three notices of discipline to Gjokaj, each carrying a five-day suspension from work. The first was for Gjokaj's failure to follow Lieb's medical directive to arrive at plant medical at 7:00 A.M. on July 25, the morning after his finger injury. The second was for falsely telling Lieb, Benitez, and Toland that Dr. Ottoni had to cut off his finger. The third was again for failing to return to plant medical at 7:00 A.M. on July 26 for another follow-up appointment.

Once Gjokaj received notice of his suspensions, he filed a grievance with U.S. Steel according to the terms of the Basic Labor Agreement (BLA) signed between the company and his union. For suspensions of five calendar days or more, an employee is entitled to a preliminary fact-finding hearing—a "9-B Hearing." At the conclusion of this hearing, the company has the authority to "convert the suspension to a discharge." *See* R. 39-9, BLA Agreement at 18–19, PID 657–658.

Gjokaj's 9-B Hearing took place on August 2, 2013. Gjokaj, Simpson, and four union representatives attended. Simpson led the hearing and took handwritten notes, which are the subject of an evidentiary dispute between the parties. During the hearing, Simpson explained the basis for Gjokaj's disciplinary suspensions and gave him an opportunity to offer his own story.

According to Simpson's notes, neither Gjokaj nor his union representatives disputed Gjokaj's failure to arrive on time for his July 25 and July 26 appointments; instead, they argued that five-day suspensions for these infractions were "too harsh" since Gjokaj eventually "c[a]me in later" both days. R. 39-33, 9-B Minutes at 2–3, PID 754–55. Simpson, however, reiterated the importance of following medical directives and noted that Lieb warned Gjokaj about the consequences of failing to do so.

In discussing his suspension for misrepresenting his medical condition, Gjokaj initially denied telling Lieb that his finger was cut off. Later in the hearing, however, he no longer refuted this statement. *See id.* at 3, PID 755 (union rep stating that "[Gjokaj] wants to explain why he said his finger was cut off," and Gjokaj explaining that it was "still cut off to me"). The union rep attempted to re-characterize Gjokaj's false statement as a practical joke. *Id.* (union rep claiming that "[h]e likes to joke a lot").

On August 8, a week after the 9-B Hearing, Simpson converted Gjokaj's 5-day suspensions into a discharge. The union appealed this discharge through the remaining steps of the grievance process, arguing that the penalty was too severe for Gjokaj's actions. Simpson upheld Gjokaj's termination. The union then sought arbitration, but later withdrew its request, and Gjokaj's termination became final.

Approximately a year later, Gjokaj filed this lawsuit against U.S. Steel, asserting claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, Michigan's Persons with Disabilities Civil Rights Act (PDCRA), Mich. Comp. Laws § 37.1101 *et seq.*, Michigan's Worker's with Disabilities Compensation Act (WDCA), Mich. Comp. Laws § 418.300 *et seq.*, and the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* After discovery, U.S. Steel filed a motion for summary judgment. Gjokaj responded to this motion

and filed his own cross-motion, seeking a declaration that he was "disabled" within the meaning of the ADA and the PDCRA. Additionally, Gjokaj filed a motion to strike several exhibits related to the grievance process that were attached to U.S. Steel's motion. The only exhibit relevant to this appeal—Exhibit 32—contained Simpson's handwritten notes from Gjokaj's 9-B Hearing. The district court denied Gjokaj's motion to strike Exhibit 32, granted summary judgment to U.S. Steel on all substantive claims, and denied Gjokaj's cross-motion as moot. Gjokaj appealed.

## II

### A. Standard of Review

We review a district court's evidentiary rulings for an abuse of discretion, *see Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013), but review de novo whether a statement qualifies as inadmissible hearsay, *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000). Likewise, we review de novo a district court's grant of summary judgment. *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe all evidence and draw reasonable inferences against the moving party. *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009). Although the moving party bears the initial burden of production, the burden then shifts to the nonmoving party to present significant and probative evidence to support his claim, including "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 & n.4 (1986). When the evidence is so one-sided that a reasonable jury could not find for the nonmoving party, the moving party must prevail as a matter of law. *Id.* at 251–52.

## B. Evidentiary Issues

Gjokaj moved to strike on evidentiary grounds Simpson's 9-B Hearing notes. These notes reveal Gjokaj's admissions of showing up late to plant medical and his concession that he "might have said that [his finger was cut off]," and serve as evidence supporting his termination. The district court denied Gjokaj's motion, concluding that the notes themselves were admissible under the business-records exception to the hearsay rule, Fed. R. Evid. 803(6), and that the relevant statements contained therein were opposing party statements, and thus non-hearsay, Fed. R. Evid. 801(d)(2). This ruling was proper.

Gjokaj first contends that Simpson's notes are inadmissible under Federal Rule of Evidence 408 as statements made during compromise negotiations between Gjokaj and U.S. Steel. Rule 408 prohibits the admission, for certain purposes, of offers to compromise along with any statement made during the course of such compromise negotiations. *See* Fed. R. Evid. 408(a)(1)–(2). However, this Rule applies only to preclude evidence related to the claim "that was the subject of the compromise." *See Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) (quoting 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5314 n.25 (1st ed. 1980)).

Here, the subject of Gjokaj's 9-B Hearing had nothing to do with the discrimination, retaliation, and interference claims he now asserts. Gjokaj did not lodge those claims against U.S. Steel until more than a year later. In fact, Gjokaj had not yet been fired at the time of the 9-B Hearing, nor did he dispute any of the behavior that formed the grounds for his discipline. He merely requested leniency in punishment. But he never claimed that his punishment was imposed because of the improper behavior of any U.S. Steel employee. Rule 408 is simply inapplicable to this fact-finding hearing that occurred well before the formulation of the claims

Gjokaj now asserts. *See Josephs v. Pac. Bell*, 443 F.3d 1050, 1064 (9th Cir. 2006) (finding no abuse of discretion in admission of statements made during a grievance proceeding because that proceeding "did not concern [plaintiff's] not-yet-filed discrimination claim[s]").

Moreover, Gjokaj's notes are not precluded from consideration on hearsay grounds. First, the notes themselves qualify as a business record under Rule 803(6). *See United States v. Collins*, 799 F.3d 554, 582 (6th Cir. 2015). Gjokaj argues that the notes cannot be properly authenticated under this exception because the author, Michael Simpson, is deceased. But it is not necessary that the preparer of the business record be the one to authenticate it. Rather, this can be done through the testimony of any qualified witness. *See id.* at 583. And to be a qualified witness, one simply needs to be "familiar with the record-keeping procedures of the organization." *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 576 (6th Cir. 1999). U.S. Steel has indicated that Jennifer Hickey, as Labor Relations Manager and Simpson's boss, will testify that the notes meet the requirements of the business records exception. This satisfied the company's burden on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Hickey is clearly familiar with the company's grievance process and easily meets the criteria of a qualifying witness. Although Gjokaj alternatively argues that Simpson's notes cannot be authenticated under Rule 901, a business record certified by a qualified witness such as Hickey is self-authenticating. *See* Fed. R. Evid. 902(11).

Second, the relevant statements contained within Simpson's notes are opposing-party statements and thus themselves non-hearsay. Rule 801(d)(2) excludes from the rule against hearsay those statements that are "offered against an opposing party" and that were either made "by the party," made "by a person whom the party authorized to make a statement on the subject," or made "by the party's agent," among others. *See* Fed. R. Evid. 801(d)(2)(A), (C)-(D).

Here, the statements in Simpson's notes are being offered by U.S. Steel against Gjokaj, and were either made by Gjokaj—the opposing party—or his union representatives—persons who were "authorized to make a statement" on his behalf and who were acting as his "agents." Thus, the district court did not err in considering Simpson's 9-B Hearing notes in granting summary judgment to U.S. Steel.

### C. Americans with Disabilities Act and Persons with Disabilities Civil Rights Act

Gjokaj first argues that U.S. Steel used his lack of cooperation following his finger injury as a basis for firing him when in actuality it was frustrated with having to accommodate him after his 2011 back injury. He brings disability discrimination claims under the Americans with Disabilities Act (ADA) and Michigan's state-law analogue, the Persons with Disabilities Civil Rights Act (PDCRA). The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees." *See* 42 U.S.C. § 12112(a). Claims of disability arising under the PDCRA "essentially track those under [the ADA]." *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (internal quotation marks omitted) (alteration in original). Therefore, we analyze the two claims together.

When a plaintiff seeks to prove disability discrimination through reliance on indirect evidence—as Gjokaj does here—the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). A plaintiff must first establish a prima facie case of disability discrimination. *Id.* If he does, then the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for its actions." *Id.* (internal quotation marks and citation omitted). Finally, it is up to the plaintiff to show that the defendant's proffered explanation is

really a pretext for discrimination. *Id.* The parties dispute whether Gjokaj made out a prima facie case, but we need not address this issue. For even assuming that he has, we find that Gjokaj has not shown a genuine dispute as to whether U.S. Steel's stated reasons for firing him were pretextual. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016).

U.S. Steel offered a legitimate, nondiscriminatory reason for firing Gjokaj: He failed to follow two medical directives requiring him to return to the plant medical department for doctor appointments at 7:00 A.M. on July 25 and 26, and he affirmatively misrepresented the nature of his finger injury to Lieb, Benitez, and Toland when he claimed that Dr. Ottoni had to "cut it off." The burden then shifts to Gjokaj to demonstrate that a jury could find that this stated reason was really pretext for discriminating against him because of his back injury.

An employee can prove pretext by showing that the proffered reason (1) "had no basis in fact," (2) "did not actually motivate the employer's action[s]," or (3) was "insufficient to motivate the employer's actions." *Ferrari*, 826 F.3d at 895 (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). The employee must set forth enough evidence so that a reasonable jury could find "both that the [employer's] reason was false, and that discrimination was the real reason" for termination. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (internal citation omitted). Thus, to survive summary judgment, Gjokaj must show that U.S. Steel did not fire him because of insubordination, and that the real reason was because of his back injury.

Although the grounds for Gjokaj's pretext argument are unclear from his brief, he cannot seriously contend that his firing had no basis in fact because he admitted to much of the behavior that formed the basis of U.S. Steel's stated reason for terminating him. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Moreover, Michael Simpson—the

individual responsible for terminating Gjokaj—"honestly believed" that Gjokaj failed to follow medical directives and misrepresented his medical condition. In our circuit, an employer is entitled to summary judgment on pretext so long as it honestly believed in the non-discriminatory, factual basis for firing an employee, even if that decision later turns out to be incorrect.[1] *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). An employer has an honest belief when it makes a reasonably informed decision grounded in particularized facts. *Id.*

Here, Simpson collected notes and statements from three witnesses prior to issuing Gjokaj's notices of discipline, and each corroborated Gjokaj's disobedience. First, Lieb, the manager of the plant medical department, confirmed that Gjokaj did not arrive at plant medical until noon on July 25 and July 26, well after his scheduled appointment times. Additionally, Lieb stated that when she called Gjokaj around 3:00 P.M. on July 25, he told her that "he was in Dr. Ottoni's office waiting for transportation to HF Wyandotte Hospital for a procedure" because his finger "could not be saved so Dr. Ottoni ha[d] to cut it off." R. 39-26, Lieb Notes at 3, PID 736. Similarly, the joint statement of Benitez and Toland aligns with Lieb's story. When Gjokaj returned to plant medical on July 25—several hours after his appointment with Dr. Ottoni and his phone call with Lieb—Benitez and Toland were the two medical personnel on duty. According to them, Gjokaj returned "with a brown paper bag" over his right hand and informed them that "[t]hey had to take [his finger] off." *Id.* He told them that it could not be saved "[b]ecause it was too infected because of all the grease and dirt, that's why they had to cut it off." *Id.*

---

[1] Gjokaj challenges the application of the honest belief rule in the aftermath of the Supreme Court's decision in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), which established the "cat's paw" theory of liability. This theory holds employers liable for the actions of biased, non-decisionmaking supervisors who influence the ultimate decisionmaker. However, our circuit has continued to apply the honest belief rule post-*Staub* to the actions of the decisionmaker. *See, e.g.*, *Marshall v. The Rawlings Co.*, 854 F.3d 368, 379 (6th Cir. 2017). If a plaintiff also raises a cat's paw theory as to the actions of a biased low-level supervisor (as Gjokaj later does here), our circuit simply analyzes the two arguments separately. *Id.* at 379–80. We do the same here.

Furnished with this evidence, Simpson issued notices of discipline to Gjokaj, and scheduled the 9-B Hearing, at which time Gjokaj did not deny his misconduct. And throughout the remainder of the grievance process, his behavior remained undisputed. Therefore, at the time Simpson made the decision to terminate Gjokaj, he did so based on Gjokaj's own admissions as well as the statements of three employees who interacted directly with Gjokaj during the relevant time period. This evidence is sufficient to find that, after a reasonable investigation, Simpson formed an "honest belief" that Gjokaj's actions warranted termination. Although Gjokaj attempts to raise a factual dispute by claiming that he never told Lieb, Benitez, or Toland that Dr. Ottoni had to "cut his finger off," his argument is irrelevant to the honest belief analysis, which asks only whether the information available to Simpson *at the time of Gjokaj's firing* was sufficient to support his termination. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017).

Finally, Gjokaj has pointed to no evidence supporting either of the other bases for proving pretext—that his actions following his finger injury did not actually motivate Simpson's decision or that they were insufficient to warrant his termination. Although Gjokaj claimed that he was really discharged because of his back injury, when pressed as to why he thought this, Gjokaj merely responded that he "d[id]n't know" and couldn't "pinpoint it." R. 47-4, Gjokaj Dep. at 166–67, PID 1356. Additionally, Gjokaj has not identified any other similarly situated U.S. Steel employee who engaged in comparable behavior, but was not terminated—the typical way an employee shows that an employer's stated reasons for termination were insufficient. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000). Instead, U.S. Steel's policy provides that insubordination—which Gjokaj was cited for twice in addition to misrepresentation—may be grounds for suspension, and later discharge.

Unable to attribute a discriminatory motive to Simpson, Gjokaj argues in the alternative that Lieb harbored bias against him and that she improperly influenced Simpson's decision to fire him. Under this so-called "cat's paw" theory of liability, if a low-level supervisor is motivated by actionable animus and influences a decisionmaker to undertake an adverse employment action against an employee, an employer may be liable for wrongful termination. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). In such cases, the bias of the non-decisionmaker is imputed to the employer. Here, Gjokaj's cat's paw theory is a non-sequitur because he has presented no evidence that Lieb harbored any bias against him, let alone bias stemming from his back injury.

Gjokaj claims generally that Lieb "was angered by [his] resistance to her methodology for minimizing lost time" and that she had a "genuine dislike of him following his back injury and history of declining medical treatment." Neither of these accusations is supported by the record. Gjokaj spends a substantial portion of his brief recounting his theory that U.S. Steel manipulates the recording of its employees' "lost time," or days away from work, in order to avoid OSHA reporting requirements and escape scrutiny for workplace injuries. But he never connects this theory to his claims of disability discrimination. In particular, there is no evidence that Gjokaj expressed any disagreement with Lieb about her lost time "methodology." Nor did Gjokaj even have any recordable lost time following his finger injury.

Similarly, Gjokaj presented no evidence that Lieb "disliked" him following his back injury. To the contrary, Gjokaj admits that he was treated reasonably. While he proclaims that various plant supervisors made "little remarks" to him in regards to his lifting restrictions post-back injury, his allegations are vague at best—he cannot remember the date, location, or names of any of these supervisors. And importantly, Gjokaj testified that none of these remarks were

made by Lieb. To the contrary, there is no evidence that Lieb had any interaction with Gjokaj or these unnamed supervisors at all in the two years between his back and finger injuries.

At oral argument, Gjokaj's counsel pointed to several purported facts as a means to infer Lieb's animus. First, counsel contended that Lieb was "frustrated" with Gjokaj after his back injury and stated that he was being "difficult" after his finger injury. But these statements mischaracterize the record. In her deposition, Lieb explains that *Dr. Madden* "express[ed] frustration" to her about Gjokaj's refusal to obtain treatment for his back. R. 47-8, Lieb Dep. at 92, PID 1429. There is no evidence that Lieb herself was frustrated with Gjokaj. Nor, contrary to Gjokaj's assertion, did she ever say that Gjokaj was being "difficult." Rather, that was how *Kovalchik* explained Gjokaj's behavior. Lieb simply informed Kovalchik that she was "having difficulty getting Nua to agree to come in." R. 47-7, Lieb Dep. at 102, PID 1409. This was, by all accounts, a true statement, and not a basis upon which a reasonable jury could infer that Lieb harbored discriminatory animus.

Second, counsel stated that Lieb made "24 phone calls" on July 24, the evening of Gjokaj's injury, including numerous calls to Kovalchik and VanBuren, both employee relations personnel. Since some of these calls occurred before Gjokaj returned from the hospital and began exhibiting defiant behavior, a jury could infer, according to Gjokaj, that Lieb contacted them prematurely to begin the disciplinary process. But Lieb's phone records show that she placed only four calls collectively to these two individuals. Moreover, discovery did not reveal whether Gjokaj was even the subject of these phone calls. Given the absence of any prior indication of animus, these four phone calls to Kovalchik and VanBuren, standing alone, are also insufficient to attribute animus to Lieb.

Lastly, Gjokaj's counsel claimed that there was no medical purpose for Gjokaj to return to the plant medical department after his July 25 appointment with Dr. Ottoni, so Lieb's directive requiring him to do so must have been rooted in discriminatory animus. But once Gjokaj returned, he met with Benitez, who completed a summary of his appointment with Dr. Ottoni and scheduled him for a follow-up visit with Dr. Madden. This was regular protocol followed by U.S. Steel, and therefore no basis for inferring that Lieb had an improper motive.

Because Gjokaj has not shown that Simpson's basis for firing him was false, improperly influenced by Lieb, or at all connected to his back injury, his discrimination claims fail.

## D. Workers' Disability Compensation Act

Next, Gjokaj argues that U.S. Steel retaliated against him in violation of the WDCA by firing him after he asserted various rights under the Act. The WDCA provides that "[a] person shall not discharge an employee or in any manner discriminate against an employee . . . because of the exercise by the employee . . . of a right afforded by this act." Mich. Comp. Laws § 418.301(13). However, the rights to which Gjokaj claims he is entitled were either provided by U.S. Steel or are not protected by the statute.

First, Gjokaj asserts that he had the right to seek reasonable medical treatment and that U.S. Steel prevented him from doing so. The WDCA does require an employer to "furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines . . . when they are needed." Mich. Comp. Laws § 418.315(1); *see Cuddington v. United Health Servs., Inc.*, 826 N.W.2d 519, 523 (Mich. Ct. App. 2012) (per curiam). But U.S. Steel complied with this statutory provision. After Gjokaj was injured, his supervisor called EMS and Gjokaj was promptly transported to the nearby hospital. The following day, U.S. Steel scheduled

appointments for Gjokaj to be seen by Dr. Madden, the plant medical doctor, and Dr. Ottoni, an orthopedic hand surgeon. U.S. Steel then continued to monitor Gjokaj's condition over the next several days.

What Gjokaj really argues is that he was entitled to see a doctor *of his own choosing.* But that is not a right compensable under the WDCA. To the contrary, in order for Gjokaj's medical care to be reimbursable, he was initially required to see U.S. Steel's choice of provider. *See* Mich. Comp. Laws § 418.315(1) (providing that "[a]fter 28 days from the inception of medical care . . . the employee may treat with a physician of his or her own choice"). And U.S. Steel did not prevent him from seeing his own doctor, in any event. *Cf. Cuddington*, 826 N.W.2d at 521. According to both Lieb and Dr. Madden, Gjokaj called at 10:00 A.M. on July 25—the morning after his injury—to inform them that he was at a medical clinic near his home. While Gjokaj disputes that he ever went to a clinic, he at least acknowledges that he did not come to plant medical until noon that day, and that he was just "at home" all morning. R. 47-4, Gjokaj Dep. at 87, PID 1340. There is no reason, then, why he otherwise *couldn't* have seen a doctor during this time, or alternatively, at any other time after leaving the plant medical department on July 25 and 26. In any event, Gjokaj admits that he eventually saw a non-U.S. Steel doctor regarding his finger.

Second, Gjokaj contends that the WDCA affords him the right to refuse unreasonable treatment. Yet, he offers no support for this contention, claiming only that the district court erred in construing the WDCA "too narrowly." Just as with the right to see his own doctor, while Gjokaj had the right to refuse treatment generally—which Gjokaj knew since he refused surgery following his back injury—this is not a right compensable under the WDCA. Plus, U.S. Steel never required him to submit to treatment; rather, it directed him to be evaluated by plant

medical doctors in order for his workplace injury to be compensable by the company. In essence, Gjokaj seeks to recast his failure to follow medical directives as merely the exercise of his "right" to refuse treatment. We decline to give this argument credence.

Finally, Gjokaj argues that he should have received a specific loss benefit, i.e., compensation, for the partial amputation of his finger. While Mich. Comp. Laws § 418.361(2) provides employees with a right to compensation for the loss of digits, Gjokaj was not entitled to monetary payment because his finger was never actually "lost." After Gjokaj's finger was crushed, he described it as "hanging just like 90 degrees, just flopped over." R. 47-4, Gjokaj Dep. at 58–60, PID 1333. But after a trip to the hospital, both sides of his finger were stitched up and his "wound was repaired." R. 39-19, Hospital Notes at 4, PID 703. Within two months, Gjokaj's finger was completely healed. Because Gjokaj never lost his finger, the WDCA does not entitle him to a specific loss benefit. Gjokaj's WDCA claim therefore fails.

### E. Family and Medical Leave Act

In a reformulation of his WDCA claim, Gjokaj asserts that U.S. Steel interfered with his rights under the FMLA by prohibiting him from seeing his own doctor and preventing him from calling in sick after he injured his finger. In order to establish an FMLA-interference claim under 29 U.S.C. § 2615(a)(1), a plaintiff must demonstrate that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *Killian v.*

*Yorozu Auto., Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).  Gjokaj at least cannot establish that U.S. Steel denied him either of the rights he asserts entitlement to under the FMLA.[2]

As discussed in the context of his WDCA claim, Gjokaj was not prevented from seeing his own doctor.  Nor did U.S. Steel refuse to allow him to call in sick.  When Gjokaj called plant medical the morning of July 26, he informed Lieb and Dr. Madden that he felt weak, hadn't eaten, and didn't feel safe to drive.  Additionally, he said he had been bleeding a lot during the night.  Concerned with Gjokaj's symptoms, Dr. Madden offered to send a cab to bring him to plant medical so that she could evaluate him.  Gjokaj testified that he had "no problem" with that solution.  R. 47-4, Gjokaj Dep. at 109–10, PID 1344–45.  Rather than being "required to come to the [plant medical department]," Gjokaj willingly agreed to do so in order to receive medical treatment.

### III

For the foregoing reasons, the district court's grant of summary judgment to U.S. Steel is **AFFIRMED.**

---

[2] Although the district court based its rejection of Gjokaj's FMLA claim on the third and fourth elements, we are free to affirm its decision on any grounds supported by the record. *See Murphy v. Nat'l City Bank*, 560 F.3d 530, 535 (6th Cir. 2009).

**RONALD LEE GILMAN, Circuit Judge, concurring.** I concur in the conclusion reached by the lead opinion and in most of its reasoning. But I respectfully disagree with the lead opinion's conclusion that Gjokaj's ADA and PDCRA claims fail to survive summary judgment because of the application of the "honest-belief rule." To the contrary, I am of the opinion that a genuine dispute of material fact exists regarding whether U.S. Steel's decisionmaker had an honest belief that Gjokaj misrepresented his medical condition.

I would nevertheless affirm the district court's grant of summary judgment to U.S. Steel because Gjokaj has failed to demonstrate a causal connection between his back injury and his termination. Similarly, he has not pointed to any evidence in the record to support the "cats-paw" theory of liability on which he relies for his argument that the reasons given for his termination were intended to mask unlawful discrimination.

The lead opinion concludes that Simpson, the decisionmaker responsible for Gjokaj's termination, had an honest belief that termination was justified because Gjokaj had (1) failed to follow medical directives by twice showing up late to the Plant Medical Department (PMD), and (2) made misrepresentations about his medical condition to PMD staff. I agree with the lead opinion's analysis insofar as it relates to Gjokaj's tardy arrivals to the PMD. Gjokaj does not dispute that he arrived late on both occasions.

But whether Simpson had an honest belief that Gjokaj had misrepresented his medical condition is a much closer question. First, the lead opinion concludes that Gjokaj admitted to making this representation during the grievance proceedings, but I find the record far from clear on this point. Simpson's handwritten notes from those proceedings relay that Gjokaj said: "I didn't tell [Lieb] the finger tip was cut off. I never said it was cut off." After a recess, Gjokaj's union representative stated that "Nua wants to explain why he said his finger was cut off."

Gjokaj then went on to say that "I might have said that [be]cause I thought it was cut off" and that "It's still cut off to me. L[o]sing it was different." The union representative added both that "In [Gjokaj's] mind, his finger was cut off" and that "he likes to joke a lot." A reasonable juror could conclude that Gjokaj actually denied making the alleged misrepresentation, and that his statement that he "might have said that" did not amount to an admission.

Second, and relatedly, Gjokaj explains on appeal that "amputation" is an ambiguous term because it could mean either a surgical amputation, in which the bone is severed, or a partial amputation, in which the skin is almost severed but the bone remains intact. He thus argues that any statements that he made about his finger being "cut off" were not misrepresentations because his finger was actually partially amputated. His statement about how his finger was "still cut off to me" could make sense in this context to a reasonable juror.

The medical evidence could also be viewed by a reasonable juror to support this conclusion. Dr. Ottoni's notes indicate that a "partial amputation" occurred. Likewise, the result of Dr. Madden's x-ray confirmed the partial amputation of the distal portion of the tip of Gjokaj's finger. Benitez's deposition testimony indicates that he understood that a partial amputation had occurred. Gjokaj argues that the PMD staff should have known both that Dr. Ottoni did not perform a surgical amputation and that Gjokaj's statements about his finger being cut off were true insofar as they referred to a partial amputation. In this context, a reasonable juror could find that Simpson did not have an honest belief that a misrepresentation had occurred.

I also note that there is no indication that Gjokaj conceded, or even came close to conceding, that he "might have said" that his finger was cut off due to an infection resulting from grease and dirt specifically. This statement was instead attributed to him by Benitez and Toland.

If Gjokaj had admitted to it, my conclusion might be different. But Gjokaj has offered a plausible explanation for anything that he "might have said."

Finally, Gjokaj points out that U.S. Steel failed to produce several documents that could have shed light on whether the alleged misrepresentations occurred and on how the decisionmakers viewed those alleged misrepresentations. Benitez's medical-summary notes, which would have been taken contemporaneously with Gjokaj's PMD visit, are either missing or were not made. In addition, Lieb requested statements from Benitez and Toland, but never requested a statement from Dr. Madden, to whom a misrepresentation was also allegedly made. Dr. Madden's notes from Gjokaj's visit contain a "clarification" that "there was never an amputation of the bone," but the notes do not explain why the "clarification" was entered, nor do they refer to any misrepresentation or statement by Gjokaj.

I acknowledge that Gjokaj admitted in his deposition to telling Dr. Madden that he could count only to 9.5. Gjokaj explained, however, that he said so in the context of explaining that he had not yet lost his finger, but worried that he might lose it after Dr. Ottoni gave him an uncertain prognosis. According to Gjokaj, having his finger cut off—i.e., partially amputated— and losing it were different, as he mentioned in his grievance hearing. U.S. Steel has offered nothing to contradict this explanation with regard to what Dr. Madden actually heard.

This court has previously concluded that, in order to invoke the honest-belief rule, an employer must conduct a reasonable investigation into the employee's alleged misconduct. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 808 (6th Cir. 1998). Although this reasonable investigation need not be perfect or involve interviews of every possible witness, *see Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012), Dr. Madden's testimony is especially important in my view because she not only allegedly heard the misrepresentations,

but also performed the x-ray that confirmed the true condition of Gjokaj's finger. U.S. Steel's failure to obtain a statement from Dr. Madden undercuts its argument that Simpson had an honest belief that the misrepresentation occurred, especially given that a genuine dispute of material fact exists with regard to whether Gjokaj actually admitted to having made any misrepresentations.

I therefore believe that Gjokaj has established the existence of a genuine dispute of material fact with regard to whether Simpson had an honest belief that Gjokaj had misrepresented his medical condition. But even if I am mistaken in my analysis, I see no need to decide this difficult question. Instead, I believe that this case can be decided on much clearer grounds.

The district court granted summary judgment to U.S. Steel on Gjokaj's ADA and PDCRA claims upon concluding both that (1) the honest-belief rule applied; and (2) Gjokaj had failed to show that Lieb, or any other supervisors who influenced Gjokaj's termination, harbored any animus against Gjokaj based on his disability. The lead opinion analyzes the lack of evidence of discrimination in the context of discussing Gjokaj's cats-paw theory. I agree with that analysis, and I write to explain my belief that the lack of animus is the crux of this case.

Gjokaj's claims of disability discrimination are based on his back injury, which occurred almost two years before his finger injury and resulted in the need for an accommodation. I believe that Gjokaj has waived any claim based on his finger injury by failing to adequately raise the issue in his brief. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 618 n.9 (6th Cir. 2014). And in any event, Gjokaj's finger injury cannot constitute a disability because it was a short-term impairment that was expected to heal, and that in fact did heal completely within two

months. *See Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 370 (6th Cir. 2013) (noting that short-term restrictions typically do not qualify as a disability).

To prevail on his disability-discrimination claim, Gjokaj therefore has to demonstrate that discriminatory animus based on his back injury was a "but for" cause of his termination. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016). Yet Gjokaj has produced no evidence to establish a causal link between his back injury and his termination. Gjokaj does not assert that Simpson himself ever exhibited any signs of discriminatory animus based on Gjokaj's back injury. Although Gjokaj claimed in his deposition that various supervisors made disparaging remarks toward him based on his lifting restrictions, he could recall only a few specific remarks and was unable to remember the names of the supervisors who made them. These vague allegations cannot support an inference of discrimination because Gjokaj failed to attribute these remarks to any supervisors who were involved in the decision to terminate him.

Furthermore, when asked what evidence he had that U.S. Steel harbored animus towards him based on his lifetime lifting restriction, Gjokaj insisted that "I just know that's why it happened." As the district court noted, such speculation is insufficient to raise an inference of discrimination. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 584 (6th Cir. 2003) (en banc).

Gjokaj also conceded that U.S. Steel accommodated his back injury by placing him on lifting restrictions. U.S. Steel never asked him to exceed those restrictions and found work for Gjokaj to perform within those limitations. And U.S. Steel essentially promoted Gjokaj by accepting him into an advanced training program *after* he had injured his back. Gjokaj was successfully participating in the program at the time of his termination. These facts indicate that U.S. Steel did not terminate Gjokaj because of his back injury.

I would thus affirm the district court's grant of summary judgment based on Gjokaj's failure to meet the but-for causation requirement. For the same reasons, I agree with the lead opinion's conclusion that Gjokaj's cats-paw theory fails because, even assuming that Lieb played a role in Gjokaj's termination, Gjokaj failed to produce any evidence that Lieb ever made any discriminatory remarks or otherwise exhibited animus relating to his back injury. I therefore concur in the judgment rendered by the lead opinion.